LARRY T. GRAY, APPELLANT, V. FUEL ECONOMY CONTRACTING
COMPANY AND THE TRAVELERS INSURANCE COMPANY, APPELLEES.

464 N.W.2d 366

Filed January 11, 1991.   No. 90-307.

James E. Harris, of Harris, Feldman, Stumpf Law Offices, and Marc A. Humphrey, of Humphrey and Haas, P.C., for appellant.

Dennis R. Riekenberg, of Cassem, Tierney, Adams, Gotch & Douglas, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Larry T. Gray appeals a finding by the Workers'

Compensation Court upon rehearing that he did not establish that a stroke he suffered during his lunch break arose out of and in the course of his employment with Fuel Economy Contracting Company (Fuel Economy).

We affirm the Workers' Compensation Court's dismissal of Gray's suit against his employer and its insurer, The Travelers Insurance Company.

Gray's four assignments of error combine to allege that the compensation court rehearing panel was clearly wrong in finding that his stroke did not arise out of and in the course of his employment with appellee Fuel Economy.

"In testing the sufficiency of the evidence to support findings of fact made by the Nebraska Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party." *Way v. Hendricks Sodding & Landscaping, Inc., ante* p. 519, 521, 462 N.W.2d 99, 101 (1990).

On January 7, 1987, at 8:45 a.m., Gray, then 45 years of age, began his first day of employment with Fuel Economy at an Omaha plant. It was the first day on which Gray had worked in 3 years following a neck and back injury he had previously suffered. He was assigned to a three-man team, pulling horizontal tubes out of a boiler. The temperature in Gray's work area was estimated to be in excess of 100 degrees. Gray was dressed in a T-shirt, a flannel shirt, and coveralls. During the morning, Gray perspired heavily.

Gray was given one 15-minute scheduled break at 10 a.m. He testified that he may have had a cup of coffee at that time. Gray took a water break one other time. There was evidence that on about three occasions, Gray drank water when he left the area to secure tools. Gray testified that after his morning break, he began experiencing dizziness, so he stuck his head into a boiler room to cool himself from an updraft.

At 12:40 p.m., Gray went to the break room to eat his lunch. After eating part of his lunch, Gray sat down on a wagon and became increasingly dizzy. He was found slumped over, and he had difficulty expressing himself. Gray may have been unconscious for a brief time. At that time, Gray's clothing was "soaking wet."

Gray arrived at Immanuel Medical Center (Immanuel) in Omaha at 2 p.m., where it was determined that he had suffered a stroke. Prior to that time, Gray had never experienced dizziness or had a stroke or heart problems.

On January 12, 1987, Dr. David Friedgood, a neurologist, examined Gray at his Des Moines, Iowa, office. The following week, Gray entered Mercy Hospital Medical Center (Mercy) in Des Moines. A cerebral angiogram taken there revealed that Gray had a blocked blood supply in an arterial system in one part of his brain. Dr. Paul From was the medical director of a division at Mercy which performed diagnostic work. He testified that from Gray's cerebral angiogram, it could be inferred that there was a clot or something else in the brain which impeded Gray's blood flow.

There was evidence that at the time of his injury, Gray smoked 2 to 2¹/₂ packs of cigarettes per day. The record reflects that he had smoked for 25 years. Dr. From testified that individuals who smoke cigarettes have a much higher risk of having a stroke. The record further reflects that since 1983 Gray had had a moderate to severe hypertensive condition. As Dr. From explained, hypertension, over time, can create plaque or blood clots, which can break free and cause an embolus or thrombus. Dr. From testified that Gray's activity level was a further risk factor for coronary atherosclerosis.

Gray had a family history of atherosclerotic vascular disease. His father passed away due to a heart attack, a stroke caused his mother's death, and one of his two siblings suffered from hypertension. Drs. From and Friedgood testified that these risk factors are not synonymous with actual vascular disease, but they nonetheless demonstrate a predisposition to that condition.

While Gray was at Immanuel and Mercy hospitals, a number of studies were performed on him in an attempt to determine if he had a neurological or a cardiovascular disease. There was evidence of atherosclerosis in Gray's internal carotid artery system. The medical expert witnesses disagreed concerning the severity of the disease. Dr. From did not believe that the minimal obstruction played any role in Gray's stroke, particularly in view of the absence of plaque. Dr. Friedgood

also concluded that Gray's arterial disease was not of a sufficient magnitude to have caused the stroke. Dr. Alan H. Fruin, an Omaha physician specializing in neurological surgery, testified that there was "lots of evidence of atherosclerotic vascular decease [sic]."

The appellees' medical expert witnesses found no causal connection between Gray's employment with Fuel Economy and his stroke. Dr. David J. Boarini, a neurosurgeon, testified that in the vast majority of strokes in younger people, the cause is usually unknown or due to small vessel disease. He further pointed to the presence of multiple risk factors in this case, such as hypertension, tobacco use, and family history. Dr. Fruin based his conclusion upon three factors: the type of stroke suffered by Gray is not related to physical activity or fatigue, the presence of several risk factors for vascular disease existing prior to the occurrence of the stroke, and the absence of any causal relationship between the stroke and Gray's employment.

At the time of rehearing, Gray testified that as a result of the stroke, he suffered from weakness in his right arm and numbness in his right hand and experienced some problems with his speech. After his stroke, Gray had been employed as an industrial sewing machine mechanic and as a truckdriver, but at the time of rehearing, he was unemployed. He was seeking employment as a truckdriver.

On January 6, 1989, Gray filed a petition in the Workers' Compensation Court, claiming benefits for his stroke under the Nebraska Workers' Compensation Act. Upon hearing before a single judge, the cause was dismissed because the court was "not persuaded that the plaintiff's exertion on the morning in question caused or contributed to cause his stroke of that date." Upon rehearing before a three-judge panel of the Workers' Compensation Court, the order of dismissal was unanimously affirmed.

"When personal injury is caused to an employee by accident or occupational disease, arising out of and in the course of his or her employment, such employee shall receive compensation therefor from his or her employer . . . ." Neb. Rev. Stat. § 48-101 (Reissue 1988). Provided an employee can demonstrate the requisite causal connection, he or she may

recover for an employment-related stroke under the Nebraska Workers' Compensation Act. See, e.g., *Smith v. Fremont Contract Carriers,* 218 Neb. 652, 358 N.W.2d 211 (1984).

Before directly addressing Gray's assignments of error, we first consider whether the compensation court panel imposed upon Gray an improper burden of proof. The compensation court panel found:

> In addition the plaintiff suffered from preexisting conditions in that he had a hereditary history of familial factors making him genetically susceptible to hypercoagulation and in addition was a smoker. Because of these preexisting conditions the plaintiff has an enhanced degree of proof to establish that an injury arose out of and in the course of employment. . . . The Court feels that the plaintiff has not met this enhanced burden of proof.

Gray argues that the compensation court panel misconstrued the medical testimony as to whether he had a preexisting condition or disease which enhanced the degree of proof necessary for him to prevail. Gray contends that while it was uncontroverted that he did have a number of risk factors which made him a more likely candidate for a stroke, none had resulted in any physiological changes in his body. Therefore, Gray asserts that it was error for the compensation court panel to apply an enhanced degree of proof.

This court has expressly disapproved of language in previous opinions which imposed an enhanced degree of proof by an employee with a preexisting disability or condition who is prosecuting a claim under the Nebraska Workers' Compensation Act. *Heiliger v. Walters & Heiliger Electric, Inc., ante* p. 459, 461 N.W.2d 565 (1990). For an award based on disability, a claimant need only establish by a preponderance of the evidence that the employment proximately caused an injury which resulted in disability compensable under the Workers' Compensation Act. *Id.* See, also, *Way v. Hendricks Sodding & Landscaping, Inc., ante* p. 519, 462 N.W.2d 99 (1990) (holding that the claimant must prove by a preponderance of the evidence that a claimed disability was caused by an accident arising out of and in the course of

employment). Thus, the critical question here is whether Gray established by a preponderance of the evidence that his employment with Fuel Economy proximately caused his stroke which resulted in disability compensable under the Workers' Compensation Act.

It is Gray's theory that his stroke was caused by his blood becoming hypercoagulated due to the exertion necessitated by his employment. Dr. Friedgood hypothesized that a hypercoagulable condition arises when a person becomes dehydrated and fluid from the blood is diverted to tissues. He further stated that as the bloodstream loses fluid, the blood becomes thicker, causing clots which lessen circulation to the brain. Dr. From hypothesized that Gray became dehydrated due to heavy perspiration, resulting in his hypercoagulable condition. Dr. From opined that Gray's thrombotic stroke occurred when his exertion reduced the ratio of water to blood cells in his blood. At that point, he believed, Gray's blood became hypercoagulable, which caused the blood to clot too easily.

While Gray was hospitalized at Immanuel, blood urea nitrogen (BUN) and electrolyte studies were performed. Dr. Fruin stated that these two tests would have been the most revealing tests for the existence of dehydration in Gray's body. The record does not disclose how a BUN study demonstrates dehydration. Dr. Fruin explained the method by which electrolyte studies disclose the level of potassium in a person's body. He testified that dehydration diminishes the level of potassium in the body because sodium is reabsorbed at the expense of potassium.

Dr. Fruin discounted the hypercoagulable theory because the BUN and electrolyte studies failed to show the existence of dehydration. From his testimony, it is clear that Dr. Fruin believed that the laboratory studies were performed at the time of Gray's admission to Immanuel. Although the first electrolyte reading was obtained at 2:15 p.m. on January 7, the record indicates that the BUN study was not conducted until 6:20 a.m. on January 8.

The compensation panel found:

The embolic blood clot according to Dr. From, was the

result of hypercoagulation which Dr. From felt was due to dehydration. *However, the Court finds the evidence is lacking that the plaintiff suffered from dehydration on the date of the accident which caused the hypercoagulation* based on the testimony of Dr. Fruin . . . who stated the plaintiff was not dehydrated because his electrolytes showed no dehydration and the BUN studies also showed no dehydration.

(Emphasis supplied.)

Gray argues that the compensation court panel was clearly wrong in its reliance on evidence concerning the BUN and electrolyte studies. It is Gray's contention that the BUN study is unreliable because it was not done until 17 hours after his stroke. By that time, Gray maintains, he had received intravenous solutions which would have normalized his BUN reading. Gray asserts that Dr. Fruin incorrectly concluded that the electrolyte studies performed at Immanuel disclosed a normal potassium reading, because later studies performed at Mercy revealed a higher level of potassium.

By attacking the evidence upon which the appellees' expert relied, Gray's contentions amount to nothing more than a disguised attempt to shift the burden of proof to the appellees. It must be kept in mind that, as the claimant, Gray had that burden of proof. The central premise to Gray's recovery is that the blood can become hypercoagulated due to dehydration from heavy perspiration, resulting in strokes. Yet, the record reflects that among the medical expert witnesses, there was disagreement whether dehydration could bring about a hypercoagulable state in the blood, by which the blood becomes more prone to clotting. When the record presents conflicting medical testimony, the Supreme Court will not substitute its judgment for that of the Workers' Compensation Court. *Binkerd v. Central Transportation Co., ante* p. 350, 461 N.W.2d 87 (1990).

Assuming arguendo the unanimous medical acceptance of the hypercoagulable hypothesis in this case, Gray has still failed to show as a factual matter that he was dehydrated, an essential condition for the theory's application. Four medical expert witnesses were deposed in this case. Drs. From and Friedgood

were Gray's expert witnesses. The appellees sought expert testimony from Drs. Boarini and Fruin. A letter from Dr. Ronald A. Cooper to Gray's counsel was also introduced into evidence.

Dr. From testified that at the time of his admission to Immanuel, Gray's "electrolyte levels were not increased to the point where we think of dehydration . . . ." Dr. From reviewed the records from both Immanuel and Mercy. He further stated that without any evidence of dehydration, it was speculative whether Gray's stroke was caused by a hypercoagulable condition. Dr. Friedgood testified, "I don't know that you can actually prove it [hypercoagulable condition] with a test. There is no specific test that can be done which will prove that this man has this type of situation. It's only something you can hypothesize and guess about." Acknowledging that the Immanuel tests could have indicated whether Gray was dehydrated, Dr. Friedgood continued, "I don't believe any of the information they obtained prove that in any way." Dr. Friedgood concluded that it was simple speculation on anyone's part as to whether Gray was dehydrated on January 7, 1987. Dr. Boarini, after reviewing medical records from Immanuel, testified that there was no evidence that Gray was dehydrated upon his admission to Immanuel. Dr. Fruin testified that Gray was not dehydrated when he arrived at Immanuel. Dr. Cooper wrote:

> When evaluating a relatively young person who has had a stroke, one looks for causes such as intracerebral hemorrhages, cardiac sources for emboli, problems with the blood vessel itself such as atherosclerosis or inflammatory conditions seen in certain forms of vasculitis, anomalies of blood vessels, and problems with the blood elements themselves or the coagulation system. When no abnormalities of these symptoms are definitely found, then one can only be speculative as to cause. *It is conceivable in Mr. Gray's case that with his physical exertion and the possible relative dehydration, that this could have induced a hypercoagulable state and predisposed him to stroke, though I have no way in definitely proving this.* The other possibility is that a

> sudden arrythmia of the heart during his activities could have set off a chain of events leading to stroke, but again this is purely speculative.

(Emphasis supplied.)

A workers' compensation award cannot be based on mere possibility or speculation, and if an inference favorable to the plaintiff can only be reached on the basis thereof, he or she cannot recover. *McMichael v. Lancaster Cty. Sch. Dist. 001*, 233 Neb. 603, 447 N.W.2d 35 (1989). Accord *Mutual of Omaha v. Broussard*, 233 Neb. 916, 448 N.W.2d 600 (1989) (asserting that a workers' compensation award may not be based on mere speculation or conjecture).

Not only is Gray's hypercoagulation theory just that, but he has failed to present any medical expert evidence that he was, in fact, dehydrated when he was admitted to Immanuel. Gray has failed as a matter of law to establish by a preponderance of the evidence that his employment on January 7, 1987, proximately caused his stroke, which resulted in disability compensable under the Workers' Compensation Act. See, *Bituminous Casualty Corp. v. Deyle*, 225 Neb. 82, 402 N.W.2d 859 (1987) (reversing compensation court's finding regarding average weekly wages because as a matter of law, the evidence failed to support the claim that the employee was receiving any compensation); *Caradori v. Frontier Airlines*, 213 Neb. 513, 329 N.W.2d 865 (1983) (determining that a physician's opinion that the accident "could have" caused the injury was insufficient as a matter of law to carry the employee's burden). For that reason, the compensation court panel's decision is affirmed.

AFFIRMED.