PAMELA S. EDMONDS, APPELLANT, V. IBP, INC., APPELLEE.
479 N.W.2d 754

Filed January 31, 1992.   No. 91-334.

Phillip G. Wright, of Quinn & Wright, for appellant.

Marie L. Welsh for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

The plaintiff-appellant employee, Pamela S. Edmonds, challenges the adequacy of the award of benefits for 6 percent permanent partial disability of each hand from the defendant-appellee employer, IBP, inc. More specifically, Edmonds claims the Workers' Compensation Court erred in failing to (1) consider certain evidence, (2) find that her thoracic outlet syndrome was proximately caused by her employment, and (3) find that she suffered a body-as-a-whole impairment which reduced her earning capacity. We affirm.

Edmonds, now approximately 30 years of age, had been working at IBP for nearly 2½ years trimming the fat and tendons from various cuts of meat as they came by her on a conveyor belt. After trimming the cuts, which then weighed between 7 and 20 pounds, she threw them onto another belt. She generally worked 8-hour shifts, but on occasion would work 16 hours.

She had no disabilities related to her employment until September 19, 1988, when, she testified, "My arm would go dead and no feeling at all, and my hands tingled and would go numb and my wrists had pain in them." The compensation court's pretrial order of March 13, 1990, recites the parties agreed that "as a result of an accident arising out of and in the course of her employment by" IBP, Edmonds developed bilateral carpal tunnel syndrome, which required tunnel release surgery on her right and left wrists.

It is Edmonds' assertion that in addition to the stipulated injuries, she also suffers from thoracic outlet syndrome. The record describes the syndrome, or condition, as occurring when nerves get pinched at the space between several muscles at a point between the first rib and the clavicle. The condition develops when the "space gets narrowed, and there's less room for the nerves and the vascular structures to sit comfortably in

that space," causing pain, numbness, or tingling.

Edmonds testified that the physician who performed the tunnel release surgery referred her to Dr. Keith McLarnan, who diagnosed the thoracic outlet syndrome. McLarnan testified that in addition to bodybuilding, peculiarities in the structure of the neck, and bony prominences on the cervical vertebrae, repetitive motion "would possibly aggravate" the condition.

When asked whether, based on a reasonable degree of medical certainty, the condition was caused by Edmonds' work, McLarnan stated that "her employement [sic] may have been a factor in the development of her thoracic outlet syndrome." However, McLarnan also revealed that he did not know what Edmonds' employment entailed, saying:

It's pretty vague, from my history. That she was working in a packing plant; and I think, frankly, that's about all the more precise information I have about what she did.

Q. Okay. Do you know what she did for the packing plant?

A. I didn't specify precisely in the history what she did.

On April 13, 1990, Edmonds moved to amend the pretrial order to include Dr. Paul Collicott as an expert witness and "all medical records, reports . . . which . . . Collicott may have regarding" her. On April 19, 1990, Edmonds further moved for an order to take Collicott's deposition, since he would be unavailable for the scheduled trial. IBP objected to the first motion, arguing that a report in which Collicott indicates that Edmonds has thoracic outlet syndrome was not timely filed. According to the transcript, Edmonds had in fact violated rule XX of the Nebraska Workers' Compensation Court's Rules of Procedure (1989), which requires all medical reports to be served on the opposing party, "in all events, within 30 days following the date the pretrial order is received and filed if the party intends to offer the report as evidence." She does not claim otherwise.

On April 30, 1990, the compensation court entered two separate orders. In the first, the court ruled that Collicott could be deposed and the deposition submitted to the court subsequently to the scheduled trial. In the second, the court amended its pretrial order so as to permit Edmonds to include

Collicott as an expert witness "and any and all medical records, reports, medical narrative, prognosis, diagnosis, and bills which . . . Collicott may have regarding . . . Edmonds."

At the May 3, 1990, trial, IBP again objected to the admission of the disputed medical report, arguing once more that it had not received the report within the required 30 days. The compensation court ruled:

> THE COURT: . . . And with regard to [the report], you are taking . . . Collicott's deposition, is that correct?
>
> [Edmonds' counsel]: Yes, Your Honor, that is scheduled.
>
> THE COURT: And you have received previous permission to do that by Judge Cavel, isn't that correct?
>
> [Edmonds' counsel]: Yes, Your Honor.
>
> THE COURT: All right, so do you have a date for that?
>
> [Edmonds' counsel]: May 23rd, isn't that correct?
>
> [IBP's counsel]: That's right, and I've cleared that with my calendar and that's satisfactory.
>
> THE COURT: All right. In that event, the objection to [the report] will be sustained . . . .

At Collicott's deposition, Edmonds nonetheless caused the medical report to be marked as an exhibit and offered it as evidence. IBP objected, pointing out that the court had ruled the report inadmissible. Edmonds argued that the only reason the court sustained the trial objection to the report was that Collicott was going to be deposed. Whatever the import of that argument, the report is found as an exhibit at the end of Collicott's deposition; the record contains no ruling on IBP's deposition objection to the report.

During the deposition, Edmonds had Collicott confirm that in the disputed report, he had written that she would have "70 percent partial or complete relief of her symptoms" if she had surgery. When asked whether, within reasonable medical certainty, "the repetitive action which you've described and the work history" were connected, Collicott responded affirmatively, saying that if what Edmonds told him was true, the "type of work that she did may have well precipitated this syndrome." In that regard, the report states that from a historical standpoint, "it appears that the thoracic outlet

syndrome appears to be related to the repetitive-type of work that [Edmonds] was doing at [IBP]."

Dr. Edward Schima, a neurologist, testified that although Edmonds had musculoskeletal pain in her left arm and it was possible she had thoracic outlet syndrome, he did not "see it's any more possible she should have it than any of us . . . ." Schima further testified that his examination revealed nothing abnormal and that in his opinion there was nothing to indicate that Edmonds suffered from the condition.

The compensation court concluded Edmonds had "failed to prove preponderantly that she sustained a thoracic outlet syndrome as a result of her accident and injury of September 19, 1988."

Edmonds first alleges that the compensation court erred in failing to consider the disputed Collicott medical report.

In support of her argument, Edmonds refers to *Miner v. Robertson Home Furnishing*, 236 Neb. 514, 462 N.W.2d 96 (1990), *appeal after remand* 239 Neb. 525, 476 N.W.2d 854 (1991). Therein, the plaintiff attempted to admit a note as part of an exhibit at his deposition, which was taken after the oral portion of the trial. The defendants objected to the exhibit. The compensation court admitted the deposition into evidence, without indicating whether it considered the objection or used the note, and dismissed the case. This court wrote at 236 Neb. at 517, 462 N.W.2d at 98:

We are not faced with a question of accepting the factual findings of the Workers' Compensation Court, but with insufficient information to determine whether the court adequately made factual findings on this issue. We must remand with directions to the court to rule on the receipt of this evidence.

The controlling difference between *Miner, supra*, and the case now before us is that here, the compensation court ruled on the objection to the medical report and excluded it. *Miner* thus has no application to the matter at hand.

Although consistency in evidential rulings is "a consummation Devoutly to be wish'd," the pretrial order concerning the disputed Collicott report, whatever it may have meant, was superseded by the trial ruling, which, in the proper

exercise of the compensation court's discretion, upheld its rule of practice. Indeed, Edmonds does not argue that the trial ruling was incorrect; she merely attempts to circumvent it. This she may not do.

Moreover, the disputed report adds nothing to Collicott's deposition testimony; to write that Edmonds' thoracic outlet syndrome appears to be work related is no different from saying that the work may have precipitated the condition.

Edmonds next complains that the compensation court erred in failing to find that her thoracic outlet syndrome was caused by her employment.

In a workers' compensation case, the plaintiff must establish by a preponderance of the evidence that the injury for which an award is sought arose out of and in the course of employment. See, *Way v. Hendricks Sodding & Landscaping, Inc.*, 236 Neb. 519, 462 N.W.2d 99 (1990); *Badgett v. St. Joseph Hosp.*, 222 Neb. 467, 384 N.W.2d 302 (1986). Hence, Edmonds' evidentiary obligation was to present medical testimony which was sufficiently definite and certain to permit drawing a conclusion that there was a causal connection between the accident and the disability. See, *Gilbert v. Sioux City Foundry*, 228 Neb. 379, 422 N.W.2d 367 (1988); *Powell v. W. G. Pauley Lumber Co.*, 217 Neb. 707, 350 N.W.2d 556 (1984).

McLarnan diagnosed the existence of the thoracic outlet syndrome but could only conclude that Edmonds' employment "may" have been a factor. Moreover, he could not even state what Edmonds actually did at IBP. Collicott similarly did not conclude that Edmonds' work was the cause of her thoracic outlet syndrome but, rather, that it "may have well precipitated" the condition.

As defined in The American Heritage Dictionary 774 (2d coll. ed. 1985), "may" is "[u]sed to indicate a certain measure of likelihood or possibility." However, an award cannot be based on mere speculation or possibility. See, *Castro v. Gillette Group, Inc.*, ante p. 895, 479 N.W.2d 460 (1992); *Gray v. Fuel Economy Contracting Co.*, 236 Neb. 937, 464 N.W.2d 366 (1991).

*Hohnstein v. W.C. Frank*, 237 Neb. 974, 982, 468 N.W.2d 597, 603 (1991), declares that " 'expert medical testimony must

be based on a reasonable degree of medical certainty or a reasonable probability . . . .' " "Probably" has been defined by this court as "reasonably," "credibly," "presumably," "in all probability," and "very likely." *Hare v. Watts Trucking Service*, 220 Neb. 403, 370 N.W.2d 143 (1985), citing *Welke v. City of Ainsworth*, 179 Neb. 496, 138 N.W.2d 808 (1965). Notwithstanding, the medical expert's testimony need not be couched in the magic words "reasonable degree of medical certainty or reasonable probability," *Hohnstein, supra* at 982, 468 N.W.2d at 603, but "medical testimony couched in terms of 'possibility' is not sufficient," *Lane v. State Farm Mut. Automobile Ins. Co.*, 209 Neb. 396, 411, 308 N.W.2d 503, 512 (1981). The *Hohnstein* court found the medical expert's conclusion adequate, based on his medical opinion to a reasonable degree that the plaintiff " 'has had these problems after the fall and one would assume they were causally related.' " *Hohnstein, supra* at 983, 468 N.W.2d at 604.

In *Fuglsang v. Blue Cross*, 235 Neb. 552, 554, 456 N.W.2d 281, 283 (1990), we held the court correctly excluded a medical opinion that " 'on a 50/50 basis' " it was " 'more likely than not' " that a particular condition predated the issuance of the policy under which coverage was sought. In so doing, we relied on *Husted v. Peter Kiewit & Sons Constr. Co.*, 210 Neb. 109, 114, 313 N.W.2d 248, 251 (1981), holding that a medical opinion amounting to nothing more "than a statement that it was 'more likely' the injury occurred" at a given time lacked "the definiteness and certainty necessary for it to be the basis for a compensation award."

In *Hatting v. Farmers Co-op Assn.*, 212 Neb. 242, 246, 322 N.W.2d 423, 425 (1982), a physician's statement that the plaintiff's injury "could have" been related to his employment and that it was "medically 'possible' " the injury could cause the disability was inadequate to establish the required causal connection. "That an injury could have possibly been caused by an employment accident is not sufficient to meet the burden imposed upon an employee in order to recover under our Workmen's Compensation Act." *Id.*

In short, expert medical testimony based on "could," "may," or "possibly" lacks the definiteness required to support

an award. "If an inference favorable to the claimant can only be reached upon the basis of possibility or speculation, he cannot recover. . . . An award cannot be based upon conflicting inferences of equal degrees of probability." *Husted, supra* at 113-14, 313 N.W.2d at 251. See, also, *Castro v. Gillette Group, Inc., supra.*

In the instant case, Schima concluded that Edmonds did not suffer from thoracic outlet syndrome, and although McLarnan and Collicott found the syndrome to exist, they were unable to give a medical opinion based on reasonable certainty that it was related to Edmonds' work. Thus, Edmonds has, as a matter of law, failed to prove a causal connection between her disability and her employment. See *Catlin v. Prairie Marketing, ante* p. 363, 476 N.W.2d 234 (1991).

In the final assignment of error, Edmonds contends that the compensation court erred in failing to find she suffers an impairment to her body as a whole which has reduced her earning capacity by at least 30 percent.

Neb. Rev. Stat. § 48-121(3) (Reissue 1988) provides that in the event of the loss or loss of use of more than one specific member of the body, such as the hands, which does not amount to total and permanent disability,

> compensation benefits shall be paid for the loss or loss of use of each such member or part thereof, with the periods of benefits to run consecutively. The total loss or permanent total loss of use of both hands . . . in one accident, shall constitute total and permanent disability and be compensated for according to the provisions of subdivision (1) of this section. In all other cases involving a loss or loss of use of both hands . . . total and permanent disability shall be determined in accordance with the facts.

In cases where the injury is to the body as a whole, compensation is determined under subsections (1) and (2) of the statute "by the employee's diminution of employability or impairment of earning power or earning capacity, and is not necessarily determined by a physician's evaluation and assessment of the employee's loss of bodily function." *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 470, 461 N.W.2d 565, 573 (1990).

Edmonds does not quarrel with the compensation court's determination with respect to the disability of her hands, but challenges its finding that she does not suffer a body-as-a-whole impairment because of her thoracic outlet syndrome. Consideration of this claim is foreclosed by our determination that if the thoracic outlet syndrome exists, Edmonds failed as a matter of law to prove it was proximately caused or aggravated by her employment.

It is certainly true the compensation court's award would have been clearer if the court had expressly stated as a finding of fact either that Edmonds did not have the thoracic outlet syndrome or that although she suffered from the condition, it was not proximately caused or aggravated by her employment. The compensation court's mixed conclusion of law and fact that Edmonds "failed to prove preponderantly" that her condition is the result of the subject accident is not particularly illuminating. Nonetheless, the record fails to sustain any of Edmonds' assignments of error.

AFFIRMED.