JOYCE A. RENNE AND DARREL RENNE, APPELLANTS, V. MELVIN D. MOSER, APPELLEE.

490 N.W.2d 193

Filed October 2, 1992.   No. S-89-1419.

Roger C. Lott for appellants.

Patrick W. Healey, of Healey Wieland Law Firm, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

Joyce A. Renne and Darrel Renne, wife and husband, appeal from the judgment on the verdict in a negligence action against Melvin D. Moser in the district court for Lancaster County. Rennes based their negligence claim on an automobile accident involving vehicles driven by Joyce Renne and Moser. Joyce Renne sued to recover damages for her personal injuries, while Darrel Renne joined the suit and sought damages for the loss of spousal consortium.

Rennes contend that the district court erred in its instructions and by refusing to give one of Rennes' requested instructions.

### THE AUTOMOBILE ACCIDENT AND INJURIES
*The Collision.*

On the morning of August 29, 1985, Joyce Renne, in her car en route to physical therapy at St. Elizabeth Community Health Center in Lincoln, was struck from the rear by Moser in his pickup, while Renne was stopped and waiting for left-turning traffic to clear ahead of her. The impact hurled Renne against her car's steering wheel. An ambulance, summoned to the scene, transported Renne to the emergency room at St. Elizabeth.

*Discharge from the Emergency Room.*

At St. Elizabeth's emergency room, a physician examined Joyce Renne. During the examination, Renne told emergency room staff that she had a history of pain, weakness, and numbness in her left shoulder which she believed to be a "thoracic outlet syndrome." The thoracic outlet is a "choke point" or a "bottleneck" for vessels and tissue on their course from the human trunk into the arm. A thoracic outlet syndrome results from compression of tissue within the interior and constricted opening under the arm at the first rib and the rib's juncture with the shoulder, shoulder blade, and collarbone, impinging on arteries and veins that leave the chest area and enter the arm and also impinging on nerves running from the head, down the trunk, and into the arm. Reduction of the thoracic outlet causes pressure on the arteries and nerves at the site indicated and may result in poor muscle control, arm pain, weakness in the hand, and numbness in some fingers.

Consequently, thoracic outlet syndrome is compression of the brachial plexus nerve trunks, the major nerve roots passing through the shoulder to the arms, and is characterized by pain in the arms, paresthesia of the fingers, vasomotor symptoms, and weakness of the muscles in the hands. See The Sloane-Dorland Annotated Medical-Legal Dictionary 697 (1987). X rays were taken, but disclosed nothing abnormal about Renne's condition. Three hours later, Renne was discharged from the emergency room.

Although she missed some work, Renne returned to full employment in late September 1985 at the same pay rate that she was receiving at the time of the automobile accident. However, Renne still experienced numbness in her left arm, "popping" in her jaw, and ringing in her ears.

## RENNES' TRIAL

*Joyce Renne's Medical History Before the Automobile Accident.*

As brought out in her trial that commenced on September 19, 1989, Joyce Renne, in 1976, complained of numbness in her right arm and pain in her left arm with numbness extending into her wrist, thumb, and index finger of her left hand. Renne contacted Dr. Louis J. Gogela, a neurosurgeon, who performed two surgical procedures in 1977 for decompression of a carpal tunnel syndrome in each of Renne's wrists. A carpal tunnel syndrome is "a complex of symptoms resulting from compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow." The Sloane-Dorland Annotated Medical-Legal Dictionary 689 (1987).

St. Elizabeth's records showed that on July 18, 1985, a little over a month before the automobile accident, Renne was admitted to the hospital's emergency room and was examined for an injury sustained when she was seated at a picnic table that collapsed and caused her to fall backward. As Renne was falling, she reached out with her left hand to break her fall. A physician, later treating Renne for her fall at the picnic table, applied a splint to immobilize Renne's left arm and wrist. Also, Renne hurt her left shoulder in the picnic table incident and

experienced pain for approximately 2 weeks. As a result of her wrist and shoulder injuries from the fall at the picnic table, Renne was undergoing physical therapy at St. Elizabeth, her destination at the time of the automobile accident.

*Temporomandibular Joint Syndrome.*

Since Joyce Renne was experiencing ringing in her ears and suffering from headaches, in November 1985, she went to Dr. Jim Ganser, a dentist. In supplying her history to Dr. Ganser, Renne did not mention an accident "other than the motor vehicle accident" of August 29, 1985, and she told him about severe pain in the area of her jaw and her difficulty with sleeping and chewing. During his examination of Renne, Dr. Ganser found "quite a bit of muscle sensitivity in the muscles of mastication and in the muscles that support the head and neck area . . . . She had problems with opening. When she did, she had some popping and clicking in the joints."

Dr. Ganser diagnosed Renne's problem as temporomandibular joint syndrome, which pertains to the point where the lower jaw joins the upper jaw in a ball-and-socket arrangement. A series of ligaments, muscles, and tendons hold the temporomandibular joint together. Temporomandibular joint syndrome is a dysfunction at the juncture of the temporal bone (part of the lateral surface of the skull at its base) with the mandible, which is the lower jawbone, and is marked by a clicking or grinding sensation in the joint, pain in or around the ear, stiffness of the jaw, and soreness upon waking. See The Sloane-Dorland Annotated Medical-Legal Dictionary 696 (1987). Dr. Ganser concluded that Renne's symptoms were "probably consistent" with "whiplash," a sudden jerking of the head either forward or backward, in which the initial trauma causes severe edema, or swelling, in the tissue surrounding the temporomandibular joint and impedes proper functioning of the joint. As Dr. Ganser explained:

> [I]t becomes difficult for the teeth to fit together the way they did before, and so you get into a situation that kind of builds on itself. Because it's difficult to chew and do everything else, you begin to brace the muscles differently and it gets to be a cycle of musculature problems that

builds on itself.

Dr. Ganser prescribed "muscle relaxants and anti-inflammatory agents" to alleviate Renne's discomfort and, to relieve pressure on the temporomandibular joint, directed Renne to wear an acrylic splint "similar to a football mouth guard" to "build an ideal bite so that she has contact on each of the teeth in an attempt to take some of the load off the joint and reduce the inflammation that takes place back in that area."

In later examining and treating Renne, Dr. Ganser found that Renne's temporomandibular joint "just doesn't seem to be totally healthy" and noted that Renne's symptoms were consistent with "intercapsular damage" to the temporomandibular joint, or in Dr. Ganser's words:

> [T]he joint itself is surrounded by a cartilaginous membrane and there's actually a piece of cartilage that fits between the ball and socket. When you move that forward in a traumatic fashion, oftentimes you'll tear the ligaments and the tendons that are attached to that. The healing process in the joint is quite a bit different than those in muscles and things because you don't have a direct circulation. It depends on transfer of fluids through the membrane walls rather than a direct blood supply, and so if you have stretched or torn those areas, the healing process can become very difficult, if not impossible.

Based on Renne's history and his examination, and "with a reasonable amount of medical or dental certainty" concerning the cause of Renne's condition, Dr. Ganser concluded that, since Renne had been "symptom free," the "act of trauma" which necessarily was the automobile accident as the only traumatic event in the history given by Renne was causally related to the accident because "one follows from the other," that is, Renne's condition resulted from the auto accident.

In the course of direct examination of Dr. Ganser, the following interrogation occurred:

> Q. Can you form — or have you formed an opinion with reasonable medical and dental certainty as to whether she will improve more over the rest of her life than she has now?
>
> A. My guess is that without intervening surgically or

something, that you're probably not going to change the situation that exists now.

Later, Dr. Ganser testified that Renne would need adjustments of the acrylic splint for her mouth because "almost invariably there's a series of adjustments necessary to make sure that it's perfectly symmetrical." When asked whether Renne's condition would become "better or worse," Dr. Ganser answered: "I expect that it will either be stable or probably deteriorate." Dr. Ganser's bill for dental services to Renne was marked as an exhibit and was received into evidence without objection.

*Thoracic Outlet Syndrome.*

Joyce Renne was examined by Dr. Chester Paul, a thoracic surgeon, in April 1987. At that time, Renne was experiencing pain and discomfort in her arms, neck, and shoulders with weakness and numbness in her right hand. Renne informed Dr. Paul that she had been involved in an automobile accident in August 1985 and told Dr. Paul about the care of Dr. William Garvin, an orthopedist, and Dr. George Walcott, a neurologist, during the 18 months preceding Renne's examination by Dr. Paul. As the result of three subsequent examinations, Dr. Paul, in 1989, was "a little more convinced" and finally rendered the diagnosis that Renne suffered from thoracic outlet syndrome. When asked whether he had an opinion, to a reasonable degree of medical certainty, concerning the causal relationship between the automobile accident and Renne's thoracic outlet syndrome, Dr. Paul responded: "I see no other circumstances which would have caused this, so my answer is yes, I think so." However, in light of Renne's history of pain, weakness, and numbness in her hands before the accident and her injury to her arm and wrist in the picnic table incident, none of which had been disclosed to Dr. Paul while he was examining or treating Renne, Dr. Paul commented: "If in fact she had similar complaints, I would assume that she had some of the problems or some kind of problem ahead" of the automobile accident. According to Dr. Paul, "Joyce's prognosis is not particularly good," and, regarding any permanent disability, even after surgery, and the possibility of future medical expenses, Dr. Paul commented: "That's just speculation."

## STIPULATED MEDICAL EXPENSES

Without agreeing that the designated medical services were connected to the automobile accident of August 29, 1985, or that such expenses "were necessary as a result of the accident," the lawyers for the parties signed a stipulation, exhibit 16, regarding the fair and reasonable charges for 12 items of expense in the total of $3,665.70. With the exception of the $176.61 charge for Joyce Renne's ambulance transportation to St. Elizabeth, the balance of the stipulated medical expenses related to doctor and hospital charges incurred by Renne at some time unspecified in the stipulation. Although exhibit 16 was received into evidence, there was no explanatory evidence presented that the medical expenses itemized on exhibit 16 were the result of Renne's automobile accident.

## INSTRUCTIONS AND VERDICT

During the conference concerning prospective instructions, the court, over Rennes' objection, indicated that instruction No. 10 would be given; namely, in considering damages proximately caused by Moser's negligence, the jury could take into account the reasonable value of medical and hospital charges "provided to the plaintiff to date," "physical pain and mental suffering the plaintiff has experienced to date," and Darrel Renne's "loss of consortium to date."

Regarding Joyce Renne's thoracic outlet syndrome, the court, also over Rennes' objection, said that instruction No. 11 would be given: "There is evidence that the plaintiff had thoracic outlet syndrome prior to the date of the accident. The defendant is liable only for any damages that you find to be proximately caused by the accident." Since instruction No. 11 is an excerpt from NJI2d 4.09 concerning aggravation of a preexisting condition, Rennes requested, but were refused, an addition or supplement to instruction No. 11 in accordance with the balance of NJI2d 4.09: "If you cannot separate damages caused by the preexisting (condition) from those caused by the (occurrence, accident, collision, et cetera), then the defendant is liable for all of those damages."

Instruction No. 12 pertained to medical expenses. Over Rennes' objection, the court stated that with the exception of

the expense for Joyce Renne's ambulance transportation to St. Elizabeth, there was no proof that the itemized expenses resulted from the automobile accident; hence, the jury was required to disregard the itemized doctor and hospital expenses designated in exhibit 16, the stipulation of the parties.

After the instruction conference, the court gave instructions Nos. 10, 11, and 12 as mentioned during the instruction conference. The jury returned a verdict for Rennes in the amount of $6,150.

## ASSIGNMENTS OF ERROR

Rennes contend that the court erred by (1) refusing to give Rennes' requested instruction on aggravation of a preexisting condition related to damages; (2) giving instruction No. 12 which removed from the jury's consideration Rennes' doctor and hospital expenses reflected in the parties' stipulation, exhibit 16; and (3) giving instruction No. 10 which removed the issues of permanency of Joyce Renne's injuries and future medical or dental expenses from the jury's consideration.

## REVIEW OF INSTRUCTIONS

*Refusal to Give Requested Instructions; Appellants' Burden.*

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law; (2) the tendered instruction is warranted by the evidence; and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

*State v. Reynolds*, 235 Neb. 662, 691, 457 N.W.2d 405, 423 (1990). Accord, *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990); *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989); *Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 438 N.W.2d 485 (1989).

As previously mentioned, instruction No. 11, as an excerpt from NJI2d 4.09, stated: "There is evidence that the plaintiff had thoracic outlet syndrome prior to the date of the accident. The defendant is liable only for any damages that you find to be proximately caused by the accident." Rennes requested the remainder of NJI2d 4.09 as an instruction on aggravation of a

preexisting condition: "If you cannot separate damages caused by the preexisting (condition) from those caused by the (occurrence, accident, collision, et cetera), then the defendant is liable for all of those damages."

A plaintiff in a negligence action for personal injury may recover damages for aggravation of the plaintiff's preexisting condition if the plaintiff proves, by a preponderance of evidence, that the defendant's negligence caused an injury which combined with plaintiff's preexisting condition to produce the loss or damage for which the plaintiff seeks compensation. See, *Carnes v. Weesner*, 229 Neb. 641, 428 N.W.2d 493 (1988); *McCall v. Weeks*, 183 Neb. 743, 164 N.W.2d 206 (1969).

While Rennes' evidence through Dr. Paul shows that Joyce Renne's condition was a thoracic outlet syndrome resulting from the automobile accident, evidence from Dr. Paul also indicates that, in reference to a thoracic outlet syndrome, Renne experienced "some kind of problem" before the automobile accident. However, Dr. Paul did not express the opinion that the automobile accident aggravated whatever may have been Renne's preexisting condition. Thus, the evidence in Rennes' case fails to establish that any preexisting condition of Joyce Renne was even aggravated and, more importantly, fails to establish that the trauma from the automobile accident aggravated any preexisting condition. Therefore, without establishing a cause-and-effect relationship between the automobile accident and Joyce Renne's condition before the accident, Rennes were not entitled to an instruction on aggravation of a preexisting condition.

Also, we note that Rennes' requested instruction, as a supplement to instruction No. 11, actually is an instruction for apportionment of damages. Whether Nebraska law allows apportionment of damages for aggravation of a preexisting condition involved in a negligence action, we need not decide and, consequently, do not decide inasmuch as Rennes, in the first instance, failed to prove causation of an aggravated preexisting condition; hence, in the absence of such causation, apportionment of damages would be inappropriate in any event. Cf. *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb.

459, 461 N.W.2d 565 (1990) (an employee may be entitled to full compensation from the employer, notwithstanding that the employee's disability is the result of a preexisting condition aggravated by a work-related injury).

Consequently, the district court correctly refused to give Rennes' requested supplement to instruction No. 11.

*Instructions Given; Appellants' Burden.*

"All instructions, read conjunctively, must correctly state the law, adequately state the issues, and not mislead the jury." *State v. Pierce*, 231 Neb. 966, 975, 439 N.W.2d 435, 443 (1989). Accord *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990). "In an appeal based on the claim of an erroneous instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant." *Rose v. City of Lincoln*, 234 Neb. 67, 74, 449 N.W.2d 522, 528 (1989). Accord *Jensen v. Archbishop Bergan Mercy Hosp., supra.*

"Jury instructions should be confined to issues presented by the pleadings and supported by evidence." *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. at 8, 459 N.W.2d at 183. See, also, *Bump v. Firemens Ins. Co.*, 221 Neb. 678, 380 N.W.2d 268 (1986).

"Submission of an issue on which the evidence is insufficient to sustain an affirmative finding is, generally, prejudicial and results in a new trial." *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. at 9, 459 N.W.2d at 183. See, also, *Mandery v. Chronicle Broadcasting Co.*, 228 Neb. 391, 423 N.W.2d 115 (1988).

*(A) Instruction No. 12: Stipulated Expenses.*

Rennes claim that the district court erred by excluding from the jury's consideration the doctor and hospital expenses itemized on exhibit 16. Although litigants may stipulate that a plaintiff's medical expenses are fair and reasonable costs or charges, to recover the stipulated expenses as damages in a negligence action, the plaintiff must prove that the defendant's conduct was the proximate cause of the medical expenses. See, *Bay v. House*, 226 Neb. 521, 412 N.W.2d 466 (1987); *Oliverius v. Wicks*, 107 Neb. 821, 187 N.W. 73 (1922). While Rennes and

Moser stipulated that the itemized medical expenses were fair and reasonable charges, there was no evidence that the automobile accident was the proximate cause of the expenses listed on exhibit 16. Thus, exhibit 16, the stipulated list of expenses, is just a collection of names and numbers without reference to any particular time. As such, exhibit 16 lacked probative value and, as irrelevant information, was properly excluded from the jury's consideration. Therefore, since there was no evidence that the itemized medical expenses on exhibit 16 resulted from the automobile accident, the district court properly excluded the itemized expenses from the jury's consideration of damages.

*(B) Instruction No. 10: Permanent Injury and Future Expenses.*

Rennes contend that instruction No. 10 prejudicially precluded the jury from considering permanency of Joyce Renne's injuries and future medical expenses for her condition.

Unless the character of an injury is objective, that is, an injury's nature and effect are plainly apparent, an injury is a subjective condition, requiring an opinion by an expert to establish the causal relationship between an incident and the injury as well as any claimed disability consequent to such injury.

*Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 785, 408 N.W.2d 280, 289 (1987). Accord, *Thilking v. Travelers Ins. Co.*, 240 Neb. 248, 482 N.W.2d 548 (1992); *Tarvin v. Mutual of Omaha Ins. Co.*, 238 Neb. 851, 472 N.W.2d 727 (1991).

A plaintiff, injured by another's negligence, is entitled to recover the reasonable value of medical expenses incurred as the result of the negligently caused injury and to recover the value of future medical expenses that are reasonably certain to be incurred as the result of the injury. See, *Steinauer v. Sarpy County*, 217 Neb. 830, 353 N.W.2d 715 (1984); *Schaefer v. McCreary*, 216 Neb. 739, 345 N.W.2d 821 (1984); *Zager v. Johnson*, 174 Neb. 106, 116 N.W.2d 1 (1962). Although the amount of future medical expenses is not required to be established with mathematical certainty before the plaintiff may recover their value, conjecture or possibility regarding future medical expenses is insufficient to submit to a fact finder

the issue of future medical expenses. See, *Steinauer v. Sarpy County, supra*; *Schaefer v. McCreary, supra*; *Hermilla v. Peterson*, 171 Neb. 365, 106 N.W.2d 507 (1960).

Before a trial court may submit to a jury any question concerning permanency of a plaintiff's injury and future medical expense, the plaintiff must have presented sufficient relevant evidence for the jury to determine whether the plaintiff has sustained permanent injury and will incur future medical expenses as a result of the injury. See, *Steinauer v. Sarpy County, supra*; *Schaefer v. McCreary, supra*; *Johnsen v. Taylor*, 169 Neb. 280, 99 N.W.2d 254 (1959).

Rennes' evidence concerning permanency of Joyce Renne's injuries and future medical expenses was the testimony of Drs. Paul and Ganser.

*(1) Testimony of Dr. Paul.*

Dr. Paul testified that, although Joyce Renne's condition was a thoracic outlet syndrome caused by the auto accident, permanency of that injury is "speculation." Dr. Paul's acknowledgment that permanency of Renne's thoracic outlet syndrome was "speculation" prevented submitting to the jury any question about permanency of the thoracic outlet syndrome and Renne's future damages, including medical expenses, regarding that injury.

*(2) Testimony of Dr. Ganser.*

In view of the restrictive effect of instruction No. 10, directing the jury to consider Rennes' situation only "to date," that is, September 1989 and not beyond, Dr. Ganser's opinion concerning permanency of Joyce Renne's temporomandibular joint syndrome and related future dental expense becomes the focal point in this appeal. When asked to express his opinion "with reasonable medical and dental certainty" on the question whether Renne's condition would improve, Dr. Ganser replied, "My guess is that without intervening surgically or something, that you're probably not going to change the situation that exists now." Rennes contend that Dr. Ganser's opinion, coupled with his further testimony that Joyce Renne's condition would "either be stable or probably deteriorate," establishes a submissible issue for the jury on the question of permanent

injury to Renne. Moser counters that Dr. Ganser's testimony, although received without objection, is, nevertheless, a "guess" and is nothing more than speculation or conjecture; therefore, Dr. Ganser's testimony supplied no basis for submitting the question of permanent injury for the jury's consideration.

Although an expert's opinion need not be expressed with "reasonable certainty" within the expert's field of expertise, but may be expressed with "reasonable probability" or with terminology and meaning similar to "reasonable probability," the expert's opinion must be sufficiently definite and relevant to provide a basis for the fact finder's determination of an issue or question. See, *Hohnstein v. W.C. Frank*, 237 Neb. 974, 468 N.W.2d 597 (1991); *Gilbert v. Sioux City Foundry*, 228 Neb. 379, 422 N.W.2d 367 (1988); *Lane v. State Farm Mut. Automobile Ins. Co.*, 209 Neb. 396, 308 N.W.2d 503 (1981).

In *Welke v. City of Ainsworth*, 179 Neb. 496, 138 N.W.2d 808 (1965), this court recognized that "probably" means " '[r]easonably; credibly; presumably[;] [i]n all probability; very likely,' " 179 Neb. at 502, 138 N.W.2d at 812, and concluded that a physician's expression " '[i]n my opinion [the] injury and resultant disability was probably due to [the incident in question],' " *id.*, when read in context, indicated the physician's "best judgment to be that the injury" was sustained in the described incident, 179 Neb. at 503, 138 N.W.2d at 812. See, also, *Hare v. Watts Trucking Service*, 220 Neb. 403, 370 N.W.2d 143 (1985).

Later, in *Lane v. State Farm Mut. Automobile Ins. Co., supra*, the court concluded that "reasonable certainty" and "reasonable probability" are one and the same and that an attempt to differentiate those phrases was a search for " 'a distinction without a difference.' " 209 Neb. at 412, 308 N.W.2d at 512. In *Lane*, the court also observed: "[T]he new Nebraska Evidence Rules, with reference to testimony by experts, do not require that medical experts testify 'with reasonable certainty.' The test would seem to be whether their specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." 209 Neb. at 412-13, 308 N.W.2d at 512. See, also, Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1989) (expert's opinion to assist fact

finder).

In light of the foregoing, we stated in *Edmonds v. IBP, inc.*, 239 Neb. 899, 479 N.W.2d 754 (1992): "[A] medical expert's testimony need not be couched in the magic words 'reasonable degree of medical certainty or reasonable probability.' " *Id.* at 905, 479 N.W.2d at 757 (quoting from *Hohnstein v. W.C. Frank, supra*). See, also, *Morton v. Hunt Transp.*, 240 Neb. 63, 480 N.W.2d 217 (1992); *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 476 N.W.2d 854 (1991).

Also, we have recognized that an expert's opinion must be examined in the context of the expert's entire testimony. See, *Morton v. Hunt Transp., supra*; *Miner v. Robertson Home Furnishing, supra*; *Welke v. City of Ainsworth, supra.*

With that background, we turn to the word "guess" used by Dr. Ganser in expressing his opinion concerning prospective change in Renne's condition and the concomitant question concerning permanency of Renne's temporomandibular syndrome.

Synonyms or substitutes for "guess" include "DEDUCE, INFER," "BELIEVE . . . THINK." Webster's Third New International Dictionary, Unabridged 1008 (1981). In *Hinrichs v. Young*, 403 S.W.2d 642 (Mo. 1966), the court considered whether a witness' use of "guess" in testifying about a vehicle's speed destroyed the probative value of the witness' testimony. In concluding that the testimony was appropriate for a jury's consideration, the Missouri Supreme Court stated: "Use of 'guess' is not necessarily destructive of a witness's testimony if it appears, for instance, from his whole testimony that the witness intended to express an opinion or judgment." 403 S.W.2d at 646. In a similar manner, the court in *Collier v. St. Louis Public Service Company*, 298 S.W.2d 455 (Mo. 1957), to determine whether evidence established that the plaintiff's injury was permanent, considered a physician's testimony that he did not "think" that the plaintiff's enlarged finger and injured shoulder would improve. The *Collier* court concluded: "It is obvious that the word 'think' as used by the doctor indicated the formation of a judgment or opinion" on the issue of permanency. 298 S.W.2d at 461.

Returning to Dr. Ganser's testimony, we note that the doctor was asked whether he had an opinion, "with reasonable

medical or dental certainty," concerning duration of Renne's condition. In answering that question, Dr. Ganser's use of "guess," in the context of his entire testimony, correlated with the doctor's expression that Renne's condition "was probably not going to change," was the expression of an opinion, that is, what the doctor deduced or inferred from all the information he had about Renne and what he considered his best judgment concerning Renne's condition in the future. Consequently, Dr. Ganser's use of "guess," in the context of his entire testimony, did not destroy the probative value of his testimony concerning Renne's prospective condition. Moreover, Dr. Ganser's subsequent opinion that Renne's condition would "either be stable or probably deteriorate" conveyed relevant information that Renne's condition would remain the same with her pain and problems from the temporomandibular joint syndrome, or would "probably deteriorate," that is, become worse. Dr. Ganser's description, therefore, supplied information that the jury was entitled to consider concerning permanency of Renne's temporomandibular joint syndrome. Also, Dr. Ganser's testimony supplied information about the necessity of future dental expenses as the result of adjustments in the acrylic splint Renne had to wear. In summary, Dr. Ganser's testimony was evidence concerning permanency of Renne's temporomandibular joint syndrome, an injury sustained in the auto accident, and was evidence regarding future dental expenses reasonably certain to be incurred by Renne. The weight of Dr. Ganser's testimony was a matter for the jury. Hence, it was error for the district court, in giving instruction No. 10, to limit the jury's consideration of damages to the date of Rennes' trial, effectively precluding the jury's consideration of Ganser's testimony in reference to permanency of Joyce Renne's injury, future expenses for her condition, and Darrel Renne's claim for future loss of spousal consortium. Since Moser's negligence and liability were established and not questioned in this appeal, the error by the district court prevented a fair trial for Rennes on the issue of future damages and necessitates our reversing the district court's judgment and granting a new trial to Rennes on the issue of damages.

## CONCLUSION

Having considered each of Rennes' assignments of error, we conclude that there was prejudicial error in the court's instruction No. 10, and, therefore, we reverse the judgment of the district court and remand this cause to the district court for a new trial on the issue of damages.

REVERSED AND REMANDED FOR A NEW TRIAL
ON THE ISSUE OF DAMAGES.