VIJAY JACOB, APPELLANT AND CROSS-APPELLEE, V. COLUMBIA
INSURANCE GROUP, DEFENDANT AND THIRD-PARTY PLAINTIFF,
APPELLEE AND CROSS-APPELLANT, AND STATE OF NEBRASKA,
SECOND INJURY FUND, DEFENDANT AND THIRD-PARTY DEFENDANT,
APPELLEE AND CROSS-APPELLEE.
511 N.W.2d 211

Filed January 25, 1994.   No. A-93-386.

Joseph W. Grant, of Gaines, Mullen, Pansing & Hogan, for appellant.

Mark J. Peterson, of Erickson & Sederstrom, P.C., for appellee Columbia Insurance Group.

Don Stenberg, Attorney General, and David T. Bydalek for appellee Second Injury Fund.

CONNOLLY, HANNON, and WRIGHT, Judges.

HANNON, Judge.

Vijay Jacob was injured in the course of his employment with Fox Custom Cabinets (Fox). At the time of Jacob's injury, Columbia Insurance Group (Columbia) was the workers' compensation insurance carrier for Fox. Jacob brought this action against Columbia and the Nebraska Second Injury Fund to recover benefits he claims to be entitled to for injuries he sustained to his left hand, left arm, and neck. The principal issue in the case is whether the benefits that a worker would otherwise recover for injury to or loss of his hand are decreased because that worker, due to a prior accident, had received a lump-sum settlement for injury to or loss of some of his fingers on that hand. There are also issues regarding the extent of the injury Jacob received from each of the accidents. A three-judge rehearing panel, with one judge dissenting, reduced the award

for Jacob's most recent injury because he had recovered for the previous injury to his hand. Jacob appeals the compensation court's decision. We affirm in part, and in part reverse and remand with directions.

## FACTS

On October 23, 1989, Jacob was working for Fox as a cabinetmaker when his left hand slipped and became trapped in the belt of a sanding machine. Before being released, most of his hand and the skin and flesh up to the middle of his forearm were sanded off.

The injuries to Jacob's hand and forearm were very extensive. For a time, the doctors considered amputating the left hand, although they were ultimately able to save part of it. The part of the hand that remains is of questionable utility. Between October 23, 1989, and April 1992, Jacob underwent skin grafting procedures, operations inserting and removing plastic rods that ran from his forearm to his hand, procedures for the reconstruction of the tendons in his arm, fusion of a joint in his little finger, and other procedures. These procedures are detailed in the record, but in light of the issues of this case we do not describe them in this opinion.

In April 1991, as a result of nausea brought on by an anesthetic administered to him for one of the numerous medical procedures, Jacob struck his head on a sink while in the hospital. Neck problems resulted from that event, and thereafter, a cervical laminectomy was performed on him in July 1991. Jacob testified that after the July surgery on his neck, a pain radiating into his left arm was eliminated. However, he stated he continues to have pain and discomfort in his neck if he remains in the same position for too long.

Jacob testified that he suffered depression as a result of the 1989 accident and was treated by a psychiatrist. Compensation for the depression was included within a part of the award that is not questioned by either party, and therefore, we will not make further reference to this matter.

When asked what types of problems he has with his left hand and arm on a day-to-day basis, Jacob testified that he cannot grab things with his fingers and that he can barely touch his left

ring finger to his left thumb. He is unable to touch his middle or little finger to his thumb. He further stated that the radiating pain in his arm was present from the time of the 1989 accident, not just from the time he struck his head in the hospital, although Jacob did say the pain radiated from his neck.

Jacob testified that he can no longer bend or flex his wrist, or move it left to right, and that it becomes stiff if he uses it too much. He further stated that he cannot grab a teacup and that even tying his shoes is difficult. He testified that he primarily uses his left hand to support things and that his wrist always hurts him. In the course of his new employment, if he puts too many tapes in his hand, the whole arm hurts.

In July 1992, Jacob participated in a vocational rehabilitation program for job placement, met weekly with a rehabilitation counselor, and sent out more than 100 job applications. Jacob stated he received computer training for secretarial and accounting clerk positions. He stated that he can hold down some of the keys on a computer keyboard with his left hand, but that he can type with his right hand only. While he has been unable to find any work which would utilize these skills, he was able to obtain temporary employment with First Data Resources on October 22, 1992, working 12 hours per day, 3 to 4 days per week at $6 per hour. He mounts tapes on and removes tapes from computer drives. At the time of the rehearing, he was seeking permanent employment with First Data. His inability to grasp objects with his left hand requires him to rely more heavily on his right hand. First Data expects an employee to change tapes in 30 seconds, but Jacob's disability makes him take a longer time to complete the task. Jacob also testified that he has problems grabbing and taking a VCR tape out of a machine, although he said these are not the same type of tapes used in his work at First Data.

## PRIOR INJURY

Jacob was also working for Fox in June 1984, when he had an accident that injured his left hand. His index finger was amputated, and his middle finger and thumb were lacerated. Ultimately, his thumb joint was fused. The documents in evidence show that as a result of this accident he suffered

100-percent disability of his first finger, 85-percent disability of his thumb, and 75-percent disability of his second finger. The settlement documents also show that the total of the weekly payments for the above-described injury was computed to be $13,715.90. A lump-sum settlement of $15,000 was agreed upon, approved, and paid.

After the first accident, Jacob returned to work with Fox and resumed the same responsibilities he had prior to that accident. He testified that after the 1984 accident he was able to perform the same cabinetwork he had done before. He needed and used his left hand for every task that his work required, including shaping and sanding cabinet doors. After the 1984 accident, he was able to pick things up and move objects with his left hand.

The 1984 injury did not affect the fourth finger, little finger, or wrist. Jacob testified that even though he lost his index finger and the flexibility in his thumb as a consequence of the 1984 accident, he did not suffer any limitation in his ability to grab things.

At the time of the 1989 accident, in addition to working for Fox, Jacob was also working 30 hours per week with Midwest Assemblers, operating a machine which places advertising inserts in the Omaha World-Herald newspaper. Jacob said the job required him to grab paper and maneuver it with both hands.

### MEDICAL EVIDENCE

Drs. Richard Murphy and Anil Agarwal, orthopedic surgeons from the same office, treated Jacob and performed all of the medical procedures he received for both the 1984 and 1989 accidents. Dr. Murphy testified that the assessment of the 1984 injury by Dr. Agarwal was a disability of 100 percent to the index finger, 15 percent to the middle finger, and 35 percent to the thumb.

Dr. Murphy also testified that none of the several surgeries, except the 1991 neck surgery, involved anything above Jacob's forearm. The trauma resulting from the 1989 accident involved only the left hand, left wrist, and left forearm. He evaluated Jacob's condition after the 1989 accident as 90-percent impairment of the left upper extremity. Dr. Murphy testified

that he believes the injury involves more of the arm than just the hand and the wrist. He based this opinion on the loss of strength, the loss of motion, and the weakness of the arm. He testified that Jacob lost a number of muscles in the forearm and that this, along with the pain radiating up the arm from the site of the injury, further shows that the injury includes more than the hand and wrist.

Dr. Murphy stated that under the American Medical Association's Guide to the Evaluation of Functional Impairment (AMA Guide), a 90-percent impairment of the upper extremity is equal to a 100-percent impairment of the hand. He gave an alternative opinion that Jacob's injury is 100-percent impairment of the hand. Dr. Murphy testified that the 90-percent impairment rating of the upper extremity would necessarily include any impairment from the 1984 injury and that had the index finger not been amputated in 1984, there is a substantial likelihood that it would have been injured in 1989.

Dr. Agarwal performed surgery on Jacob to fuse vertebrae in order to treat the ruptured disk which had resulted when Jacob hit his head against the sink while vomiting. Dr. Agarwal testified regarding Jacob's disability from the neck injury, but since that injury was compensated by a portion of the award that is not disputed in this appeal, that testimony will not be set forth herein.

Dr. Agarwal testified that the 1984 injury involved two fingers and a thumb, as opposed to an injury to the hand itself. The AMA Guide allows the transfer of injuries to fingers into an injury to the hand, and even into the body as a whole. Dr. Agarwal testified that he had occasionally examined and treated Jacob in relation to the 1984 injury. He also acknowledged that he had given a rating of 75-percent impairment of the left hand as a result of the 1984 accident.

Dr. Agarwal stated that the 1989 injury was the most severe he had seen in his 25 years of practice. He stated that there was no comparison between the 1984 and 1989 injuries and that "the 1989 injury was very extensive, almost total loss of the hand as far as I'm concerned."

Columbia called as an expert Dr. Donald Gammel, a physician who specializes in disability evaluation. He stated

that he was asked to assess the extent of impairment to Jacob's left hand as a result of the 1989 accident. This involved an evaluation of "the hand, all the digits, loss of digits, shortening, loss of range of motion, any joints that are frozen, and then computing — adding those all up and computing for a total loss."

Dr. Gammel also testified that he had evaluated the 1984 injury to Jacob's hand and had concluded that there was a 60-percent disability to the hand. This evaluation was based on the medical history maintained by Dr. Agarwal and the AMA Guide for the assessment of impairment of digits, which is determined separately from the loss of a hand. He testified that on this basis he was able to separately apportion the percentage of loss to both the digits and the hand. Dr. Gammel also opined that a 60-percent disability to the hand would, in turn, be a 36-percent disability to the upper extremity.

Dr. Gammel testified that the degree of disability attributable to the 1989 accident was 32 percent and that the 1989 accident affected the hand only. He stated that Jacob's total hand disability was 92 percent, which is a combination of the 1984 disability of 60 percent plus the 32-percent disability suffered from the 1989 accident. Dr. Gammel also testified that the arm itself suffered an 18-percent disability as a result of the 1989 accident. However, immediately thereafter he stated that he did not believe the 1989 accident resulted in an injury to the arm, or upper extremity. His basis for this conclusion was that anything below the elbow is considered part of the hand.

Dr. Gammel disputed the deposition testimony of Dr. Murphy that Jacob received a 100-percent disability to the hand. Dr. Gammel stated that in order for there to be a finding of 100-percent disability, there must be amputation of all five fingers of the hand at the knuckles, and that this case did not involve that type of injury.

At one point during the cross-examination of Dr. Gammel by Jacob's counsel, the following exchange occurred:

Q You didn't do any analyses or subjective analyses of the ability to use the hand before and after 1989 in arriving at your opinions, did you?
A No.

Q It's strictly the math that comes out of the [AMA Guide]?

A That's correct.

Earlier in this cross-examination, the following was recorded:

Q So if Mr. Jacob's testimony was to the effect that his left hand was nothing more than an object that he could use to push and pull other things with, you would disagree with him in that regard?

A I would still state that he has 92 percent loss of that hand.

Q Because you perform your calculations and you go back to the book and decide what the extent is and then you reduce it by whatever may have been created, again by the book, in the 1984 accident?

A That's correct.

On examination by one member of the compensation court, Dr. Gammel stated that he had not made a determination as to whether the neck injury resulted in a permanent impairment to Jacob's upper extremity.

### EXPERT TESTIMONY ON LOSS OF EARNING CAPACITY

A substantial issue in the compensation court was the loss of earning power sustained by Jacob. The record contains extensive expert testimony on this issue, with one witness stating a loss of earning capacity due to the neck injury and depression. The compensation for these injuries was included within the award on rehearing, and neither Jacob nor Columbia assigns error to the findings of the compensation court on this matter. Therefore, such evidence is not summarized in this opinion.

### COMPENSATION COURT'S AWARD

On April 12, 1993, a three-judge panel of the compensation court entered its award on rehearing. The court found that Jacob was entitled to compensation and that the parties had stipulated that the injuries to his hand or arm and neck and the depression were compensable. Therefore, the court found that the principal issue was the extent of Jacob's disability to his left hand or arm and the extent of his loss of earning power due to

the neck surgery and depression.

The court found that the injury was to the left hand, not the left arm, and that any pain which Jacob complained of above the left elbow was from the neck surgery. The court further held the disability suffered from the 1984 accident must be apportioned so as to determine the extent of disability suffered by Jacob from the 1989 accident. The court found that "§48-121 does not contemplate such a double recovery and has therefore based its finding of permanent disability on the opinion of Dr. Gammel." It therefore found that Jacob had suffered a permanent partial disability of 32 percent to his left hand from the 1989 accident.

The compensation court awarded 56 weeks of compensation for the 32-percent permanent partial disability to the left hand, amounting to $242.69 per week for 56 weeks, and awarded $72.81 per week for $153^3/_7$ weeks for a 30-percent permanent loss of earning power. The court also found that Columbia had appealed from the single-judge ruling and had not obtained a reduction in the original award. Therefore, the court awarded Jacob a $1,500 attorney fee, along with a $300 witness and court reporter fee for Dr. Agarwal's deposition.

The compensation court found Columbia failed to prove that Jacob's injuries of 1984 and 1989 combined to create a disability which was substantially greater than that which would have resulted from the 1989 injury considered in and of itself. The court dismissed the Second Injury Fund and ordered Columbia to pay the Second Injury Fund $41.20 for expenses incurred with regard to the rehearing proceeding.

The compensation court also made findings and orders on temporary total disability, rehabilitation costs, medical expenses, and other undisputed matters which are not set forth herein. Detailed findings of the compensation court will be described when the point they relate to is discussed.

Judge James Monen submitted a dissent because he did not believe double recovery would result from a ruling which provided a "100 percent loss of use of the left hand . . . ."

## ASSIGNMENTS OF ERROR

Jacob has appealed the Workers' Compensation Court

decision, alleging the court erred in (1) finding that Jacob had sustained a disability only to the left hand following the October 23, 1989, accident, rather than finding that the disability was to the left arm; (2) apportioning Jacob's disability between the 1984 accident and the 1989 accident; and (3) reducing the disability benefits for the left hand or arm by the preexisting disability sustained in 1984 to three fingers of Jacob's left hand.

Columbia has cross-appealed, alleging that the court erred in assessing an attorney fee and costs against Columbia and that costs and fees related to the deposition of Dr. Agarwal are not items provided for under Nebraska law.

The State of Nebraska filed a brief on behalf of the Second Injury Fund and argued that the Second Injury Fund was properly dismissed by the compensation court. After the hearing by a single judge of the compensation court, the Second Injury Fund was dismissed, and in its application for rehearing, Columbia alleged the court had erred in dismissing the Second Injury Fund. On rehearing, the three-judge panel again dismissed the Second Injury Fund. In this appeal, neither Jacob nor Columbia assign the dismissal of the Second Injury Fund as error, although the State has filed a brief in this appeal which supports the propriety of the dismissal. We do not believe the question of the dismissal of the Second Injury Fund is before us, and we therefore will not discuss that issue.

## SCOPE OF REVIEW

A decision by the Workers' Compensation Court after rehearing has the same force and effect as a jury verdict, and findings of fact will not be set aside unless, after reviewing the record in the light most favorable to the successful party, the appellate court determines that those findings are clearly erroneous. *Hernandez v. Hawkins Constr. Co.*, 240 Neb. 129, 480 N.W.2d 424 (1992); *Wiese v. Becton-Dickinson Co.*, 239 Neb. 1033, 480 N.W.2d 156 (1992); *Miller v. Goodyear Tire & Rubber Co.*, 239 Neb. 1014, 480 N.W.2d 162 (1992); *Anthony v. Pre-Fab Transit Co.*, 239 Neb. 404, 476 N.W.2d 559 (1991); *Omaha Processors v. Bloomquist*, 237 Neb. 223, 465 N.W.2d 731 (1991). Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp.

1992), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Kraft v. Paul Reed Constr. & Supply*, 239 Neb. 257, 475 N.W.2d 513 (1991).

## DISCUSSION

### INJURY TO LEFT ARM VERSUS LEFT HAND

Jacob maintains, and Dr. Murphy opined, that Jacob suffered a 90-percent impairment to his left arm, or upper extremity, which equated to 100-percent loss of use of the hand, whereas Columbia maintains, and Dr. Gammel opined, that after the 1989 accident Jacob had a 92-percent disability of the left hand. This dispute is rather clearly settled by Neb. Rev. Stat. § 48-121(3) (Reissue 1988), which provides in significant part: "Amputation between the elbow and the wrist shall be considered as the equivalent of the loss of a hand . . . . Amputation at or above the elbow shall be considered as the loss of an arm . . . ." If amputation of the arm between the wrist and the elbow is not considered the loss of an arm, it is difficult to hold that injury of the arm between the wrist and the elbow is more than an injury to the hand, unless of course there is evidence that the function of the arm above the elbow is somehow limited. There is no evidence that Jacob's arm was injured separate and apart from the injury he received below the elbow.

We have not found a case which involved granting or denying a claim that an injury to the arm below the elbow is only an injury to the hand, but Nebraska has considered several cases where the worker maintained that an injury to the finger was a disability of the hand. The rule is established that if fingers are injured or lost, then barring unexpected complications, benefits to which the worker is entitled to recover are measured in terms of loss of or injury to the fingers and not in terms of the disability that the hand might have suffered because the fingers

were damaged or lost. See, *Nordby v. Gould, Inc.*, 213 Neb. 372, 329 N.W.2d 118 (1983); *Herold v. Constructors, Inc.*, 201 Neb. 697, 271 N.W.2d 542 (1978); *Ottens v. Western Contracting Co.*, 139 Neb. 78, 296 N.W. 431 (1941); *Greseck v. Farmers Union Elevator Co.*, 123 Neb. 755, 243 N.W. 898 (1932). The basis of the rule is that the Legislature has provided for injuries to scheduled members, and so long as the injury is only to a lesser member, the scheduled compensation for loss of or injury to that member controls, unless there is an unusual and unexpected result to the greater members. *Id.* We are confident that this principle controls for loss of or injury to any of the scheduled members listed in § 48-121(3). In this case the evidence shows the lower arm was damaged, but, except for the later injury to Jacob's neck, there was no injury to his arm above the elbow, and the impairment Jacob suffered was below the elbow.

### DR. GAMMEL'S TESTIMONY

The compensation court stated it had "based its finding of permanent disability on the opinion of Dr. Gammel." The court awarded $242.69 per week for 56 weeks for a 32-percent permanent partial disability to the left hand. The 32-percent disability was arrived at by Dr. Gammel's subtracting the 60-percent permanent disability to the left hand which he found Jacob had suffered in 1984 from the 92-percent permanent disability to the left hand which Dr. Gammel found Jacob suffered from after the 1989 accident. Jacob questions the legal sufficiency of Dr. Gammel's testimony. Two questions arise in considering Dr. Gammel's testimony: Did Dr. Gammel use the correct procedure in arriving at a rating of 60-percent disability of the left hand as a result of the 1984 injury when the injury in 1984 was only to Jacob's fingers? Did Dr. Gammel follow the dictates of our statutes when he determined Jacob has only a 92-percent disability to his left hand after the 1989 accident?

The first question is really whether it was correct for Dr. Gammel to measure Jacob's 1984 disability in terms of a disability to his hand when, under Nebraska law, Jacob could and did recover for disability to his fingers only. Sixty-percent disability of the hand would be 60 percent of 175 weeks, or 105

weeks, whereas the schedule attached to the application for lump-sum settlement shows Jacob's settlement was for loss and disability to his fingers, which was computed at 108½ weeks less 16 weeks of permanent partial disability. After the deduction of permanent partial disability, there remained 92½ weeks, upon which the lump-sum settlement was based. At the very most, Jacob's benefits should not be reduced by more disability than he was in fact paid for the 1984 injury.

Dr. Gammel based his opinion regarding disability of the hand upon the AMA Guide's assessment of impairment of digits, which allows for measuring loss of or injury to fingers in terms of disability to the hand, arm, or even the body. Dr. Murphy did the same thing when he opined that Jacob's disability after the 1989 accident was 90-percent impairment of the upper extremity. Dr. Murphy also based his opinion on the AMA Guide. However, Nebraska case law clearly holds that injury to a scheduled member cannot be translated into the loss of a greater member when the disability is the usual, logical, and expected consequence of the injury to the lesser member. See, *Nordby, supra*; *Herold, supra*; *Ottens, supra*; *Greseck, supra*. On the basis of that authority, we hold that Dr. Gammel could not properly measure Jacob's recovery as a partial loss of the hand when he was, in fact, compensated for loss of and injury to the fingers.

Dr. Gammel also testified that Jacob's left hand is only 92-percent disabled, whereas Dr. Murphy testified that Jacob suffered 100-percent disability of the hand. Dr. Gammel explained his opinion by stating that for a finding of 100-percent disability of the hand, there must be amputation of all five fingers of the hand at the knuckles. Dr. Gammel stated that he based his opinion on the AMA Guide. Clearly, Dr. Gammel based his opinion on the fact that part of Jacob's hand remained, and he did not consider whether the part of the hand that remained was useless. His testimony ignores that part of § 48-121(3) which states, "Permanent total loss of the use of a finger, hand, arm, foot, leg, or eye shall be considered as the equivalent of the loss of such finger, hand, arm, foot, leg, or eye." Dr. Gammel clearly did not consider the evidence on the usefulness of the hand, because the AMA Guide did not

provide for such a consideration, and therefore, his testimony that Jacob suffered only a 92-percent impairment of the hand is not properly based on the evidence presented and the applicable statute.

■ As a general rule, when the record in a workers' compensation case presents conflicting medical testimony, the appellate court will not substitute its judgment for that of the compensation court. *Leitz v. Roberts Dairy*, 237 Neb. 235, 465 N.W.2d 601 (1991); *Riha v. St. Mary's Church & School, Inc.*, 209 Neb. 539, 308 N.W.2d 734 (1981). However, the record shows that the compensation court specifically relied upon Dr. Gammel's testimony, which was based upon an assumption contrary to the law of this state, that is, that a finding of 100-percent loss of a hand could not be given unless the fingers of the hand were amputated at a certain point.

■ " 'Unless the character of an injury is objective, that is, an injury's nature and effect are plainly apparent, an injury is a subjective condition, requiring an opinion by an expert to establish . . . any claimed disability . . . .' " *Renne v. Moser*, 241 Neb. 623, 634, 490 N.W.2d 193, 200 (1992). However, if the injury is objective and the conclusion to be drawn from basic facts does not require special technical knowledge, an expert is not necessary. *Clark v. Village of Hemingford*, 147 Neb. 1044, 26 N.W.2d 15 (1947). In this case there is no doubt that Jacob has lost all practical use and function of his hand.

We find persuasive *McGartland v. AMPCO-Pittsburgh Corp.*, 489 Pa. 205, 413 A.2d 1086 (1980), a Pennsylvania case dealing with an employee's loss of his left hand. In *McGartland*, the compensation court's referee found that the employee had sustained 100-percent loss of his hand on the basis of the employee's testimony that he could not hold anything in his hand, button his clothes, open a car door, or wash himself with his left hand. That finding was reversed in two subsequent appellate proceedings, but was then reinstated by the Pennsylvania Supreme Court because that evidence was found to support the referee's decision. We find the evidence in this case strikingly similar to that of the evidence in *McGartland*. We also cite another Pennsylvania case which has similar facts. In *Gindy Mfg. Co. v. Workmen's Comp. App. Bd.*, 32 Pa.

Commw. 128, 378 A.2d 492 (1977), the commonwealth court based its decision to affirm the findings of the compensation court's referee on a well-established "practical intents and purposes" test used in that jurisdiction. The employee had provided evidence that, while he could make some use of his right hand in picking up papers and shifting a car's automatic gearshift, he could not grasp tools, button a shirt, or pick up small objects, and he had difficulty tying his shoes. The commonwealth court stated that the legislative history behind the Pennsylvania Workmen's Compensation Act indicated that " ' " '[t]he test to be applied is whether the claimant has suffered "the permanent loss of use of the injured member for all practical intents and purposes." ' . . ." ' " *Id.* at 131, 378 A.2d at 494. While these Pennsylvania cases do not control our decision, we find they are persuasive on the question of whether or not Jacob has suffered such extensive disability to his hand that the hand serves no real purpose.

In the present case, Jacob testified that the primary use of his left hand is to support objects. He cannot grab items with his fingers, he can barely touch his ring finger to his thumb, and he is unable to touch his middle or little finger to his thumb. He can no longer bend or flex his wrist, and it becomes stiff if he uses it too much. The determination of the usefulness of Jacob's left hand is hardly a medical question. It is obvious that Jacob's hand is useless for industrial purposes, although he may get some incidental, de minimis benefit from it. We find as a matter of law that the hand is useless and that Jacob has suffered 100-percent disability to his left hand.

### Apportionment

The next issue is whether apportionment of the injury, as a matter of law, was proper. Was it proper to decrease the award issued for the 1989 injury to the hand by the award Jacob received for the 1984 injury to the fingers of the hand? The compensation court concluded such a deduction was proper, based on Dr. Gammel's testimony. We have been unable to find any Nebraska cases specifically on point, but we find some indication of the answer in the statutes and other cases.

We note that if an employee has a preexisting physical

disability and later suffers further injury, the benefits received by the employee would not be decreased by taking the preexisting condition into account. In *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 473, 461 N.W.2d 565, 575 (1990), the Supreme Court stated, by way of quoting *Benson v. Barnes & Barnes Trucking*, 217 Neb. 865, 354 N.W.2d 127 (1984), the following: " '[A]n employee is entitled to full compensation, notwithstanding the fact that his present disability is the result of an aggravated preexisting condition. . . .' " Columbia does not point to any Nebraska cases that show a tendency to limit that rule.

This is not a Second Injury Fund case, but the treatment of an existing disability when the Second Injury Fund is liable throws some light on how the Legislature and the Supreme Court treat preexisting conditions. Neb. Rev. Stat. § 48-128 (Cum. Supp. 1992) provides that "[i]f an employee who has a preexisting permanent partial disability whether from compensable injury or otherwise . . . receives a subsequent compensable injury," then the Second Injury Fund may be made a party to the action. The statute then goes on to provide for the conditions under which the Second Injury Fund will be liable. In this case, the evidence did not establish that there would have been a lesser degree of disability had the preexisting condition not existed. However, had the Second Injury Fund applied, Jacob's recovery would not have been less because of the extent and severity of the injury resulting from the 1989 accident. The significant point is that benefits to an employee are not decreased because he or she had a preexisting condition that had been compensated for by the same or a different employer.

In *Heiliger*, the Supreme Court also stated: "Thus, allocation of disability attributable to a work-related injury and disability attributable to an antecedent or preexisting disability or condition which may or may not be work-related is irrelevant in this case inasmuch as there is no claim against the Second Injury Fund." *Id.* at 473, 461 N.W.2d at 575.

The effect of Dr. Gammel's testimony was to allocate Jacob's present disability between his preexisting condition and his present condition. This approach appears to be prohibited by

the above rule.

In *Benson,* the employee was found by a single judge of the compensation court to be totally disabled, and the responsibility for the injury was apportioned between the employer and the Second Injury Fund at 15 percent and 85 percent respectively. On rehearing, the compensation court dismissed the employee's petition because he had not proved the liability of the Second Injury Fund with expert testimony. Chiefly, the case stands for the proposition that the employer has the burden to prove the Second Injury Fund's responsibility. However, in that case the employee had previously been injured in a work-related accident and had received a lump-sum settlement based on a 37½-percent disability to the body as a whole. Dismissal of the Second Injury Fund was upheld, but the cause was remanded with directions that the compensation court determine the extent of disability. In connection with this case, *Benson* is significant because although the employee had already been compensated for 37½-percent permanent partial disability, there was no attempt to decrease the employee's benefits for permanent disability.

Columbia argues that if Jacob's recovery for the 1989 accident is not decreased by the 1984 injury, Jacob will receive a double recovery. The Supreme Court did not appear to be bothered by the expected similar double recovery for disability in *Benson.*

In *Ames v. Sanitary District,* 140 Neb. 879, 2 N.W.2d 530 (1942), the plaintiff lost the use of his left eye in an accident covered by workers' compensation. He had an existing eye condition, and the fact question that was litigated was whether a preexisting eye condition rendered the plaintiff's eye industrially useless before the accident. The fact question was determined in favor of the plaintiff, and the plaintiff was awarded full compensation for the loss of the eye notwithstanding the fact that the eye had limited utility before the accident. In affirming the award, the Supreme Court stated:

> It is to be observed that our statutes nowhere define the characteristics and powers of the normal eye. The obvious intent thereof is to compensate and indemnify the owner of an eye capable of industrial use and injured in industry

to the full extent of his industrial loss occasioned thereby. This seems in accord with the better reasoned cases.

*Id*. at 881, 2 N.W.2d at 532.

We believe this rule may be correctly stated to have a broader application: The intent of the Workers' Compensation Act is to compensate employees for scheduled members formerly capable of industrial use, but which are injured in industry, to the full extent of the industrial loss occasioned thereby. This is true notwithstanding the fact that the injured member had already been injured or was otherwise imperfect prior to the accident.

The evidence is undisputed that after the 1984 injury Jacob returned to his former employment and performed the same job that he had performed before that accident. His use of the hand in the same industry for almost 5 years following the 1984 accident convincingly establishes that Jacob's hand was industrially useful. The 1989 injury made him seek a new occupation at lower earnings.

The parties agree that the question before the court is really one of whether Nebraska is an apportionment state. We are unable to find any cases holding that Nebraska is or is not an apportionment state. On the subject of apportionment, Prof. Arthur Larson, a notable academic on workers' compensation law, states:

> The problem of apportionment of a compensable loss is encountered in three principal forms: between successive employers or carriers, when the final disability is traceable to exposures or incidents under two or more of them; between an employer and a Second Injury fund, when a preexisting condition covered by the Fund is involved; and between an employer and the employee himself, when a prior personal disability contributes to the final disabling result.

2 Arthur Larson, The Law of Workmen's Compensation § 59.20 at 10-492.337 to 10-492.339 (1993).

In his continued discussion of the subject of apportionment Professor Larson states:

> Note, however, that this combining of a prior non-disabling condition and a later work-connected

injury may produce compensable aggravated disability even though the one does not act directly upon the other. For example . . . . It will be observed that the courts in these cases define preexisting disability, not as functional disability, but as disability in the compensation sense of impairment of earning capacity. This approach is put to its sharpest test when the prior impairment was in the form of loss of specific members covered by the schedule. For example, when a claimant, although he had earlier lost three fingers of his left hand, had continued to work at regular employment, and then lost his entire left hand, he was held entitled to compensation for the hand without deduction for the schedule value of the fingers.

*Id*. at § 59.22(c) at 10-492.394 to 10-492.395.

Professor Larson continues to discuss cases from other jurisdictions and then states in the same section:

This is correct under the usual apportionment statute, which allows compensation for the disability that would have existed if the prior injury had not occurred, since the final effect of loss of the hand itself is the same whether several fingers were previously missing or not. . . .

To be apportionable, then, an impairment must have been independently producing some degree of disability before the accident, and must be continuing to operate as a source of disability after the accident.

*Id*. at 10-492.396 to 10-492.397.

In the case at bar, Jacob's loss of one finger and injury to two others did not produce disability before the 1989 accident, and these injuries did not operate as a source of disability after either the 1984 or the 1989 accident.

Professor Larson states there is contrary authority, and he cites *Miles v. Gallagher*, 194 Pa. Super. 338, 168 A.2d 805 (1961). Columbia relies upon *Miles*, but we conclude that Jacob is entitled to compensation for the loss of his left hand without any deduction for the previous 1984 injuries to his fingers.

## ATTORNEY FEES ON REHEARING

Finally, we address the cross-appeal by Columbia, in which Columbia asserts that the compensation court, on

rehearing, erred in assessing $1,500 in attorney fees and $300 in costs against Columbia. Columbia argues that in the hearing before the single judge, Jacob recovered temporary total disability benefits for so long as he remained disabled and that upon rehearing the temporary total disability benefits were terminated and replaced by an award for permanent partial disability. Columbia argues that it therefore obtained a reduction in the award and that under Neb. Rev. Stat. § 48-125 (Cum. Supp. 1992), Jacob is not entitled to an attorney fee. In support of that proposition, Columbia cites *Groves v. Midland Food Sys.*, 2 NCA 114 (1993). Under the Nebraska Supreme Court Rules of Practice and Procedure, it is inappropriate for a party to cite an opinion of the Court of Appeals which has not been designated for permanent publication. Neb. Ct. R. of Prac. 2E(4) (rev. 1993). However, we observe that *Groves* relies upon *Butler v. Midwest Supply Co.*, 212 Neb. 421, 322 N.W.2d 815 (1982), which is a Supreme Court decision. *Butler* dealt with a situation where the three-judge panel terminated temporary total disability benefits that had been awarded at the single-judge hearing, but the Workers' Compensation Court did not replace the temporary total disability award with an award for permanent partial disability in either *Butler* or *Groves*.

A case that is more applicable to the case at bar is *Mulder v. Minnesota Mining & Mfg. Co.*, 219 Neb. 241, 361 N.W.2d 572 (1985), where on rehearing the Workers' Compensation Court replaced an award of temporary total disability which was to continue so long as the worker remained disabled with an award for 50-percent permanent partial disability. In *Mulder*, the worker was allowed an attorney fee of $1,500 on rehearing, and the defendant assigned this as error on appeal. The Supreme Court held that when an employee is granted temporary total disability benefits, but upon rehearing that award is replaced by an award for permanent partial disability, the employee may still be granted attorney fees for services of an attorney at the rehearing. We find that the assessment of fees and costs against Columbia should be affirmed.

## CONCLUSION

We find that the compensation court erred in awarding Jacob recovery for only a 32-percent permanent partial disability of his hand. We therefore reverse that portion of the award on rehearing and remand the cause with directions that the compensation court is to enter an award allowing Jacob to receive compensation for 100-percent loss of the use of his left hand due to the 1989 accident. All other terms of the award on rehearing are affirmed.

Jacob obtained considerable relief on this appeal and is entitled to an attorney fee of $1,500.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.