Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/20/2021 09:14 AM CDT

Benjamin Melton, appellant, v.
City of Holdrege, appellee.

___ N.W.2d ___

Filed May 28, 2021.    No. S-20-721.

1. **Workers' Compensation: Appeal and Error.** A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.

2. ____: ____. On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong.

3. ____: ____. An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law.

4. **Workers' Compensation.** Neb. Rev. Stat. § 48-121(3) (Reissue 2010) generally provides the manner by which a worker is compensated for the loss or loss of use of a scheduled member.

5. **Damages.** As a general rule, a party may not have double recovery for a single injury.

6. **Workers' Compensation: Attorney Fees: Penalties and Forfeitures: Time.** Neb. Rev. Stat. § 48-125 (Cum. Supp. 2020) authorizes a 50-percent penalty payment for waiting time involving delinquent payment of compensation and an attorney fee, where there is no reasonable controversy regarding an employee's claim for workers' compensation.

7. **Workers' Compensation: Attorney Fees: Words and Phrases.** A "reasonable controversy" exists (1) if there is a question of law previously unanswered by the Supreme Court, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the compensation court about an aspect of an employee's claim, which

conclusions affect allowance or rejection of an employee's claim, in whole or in part.

8. **Workers' Compensation: Words and Phrases.** Whether a reasonable controversy exists under Neb. Rev. Stat. § 48-125 (Cum. Supp. 2020) is a question of fact.

9. **Workers' Compensation.** Whether an injured worker is entitled to vocational rehabilitation is ordinarily a question of fact to be determined by the compensation court.

10. ____. A workers' compensation award cannot be based on mere possibility or speculation.

Appeal from the Workers' Compensation Court: Dirk V. Block, Judge. Affirmed.

Todd D. Bennett, of Rehm, Bennett, Moore & Rehm, P.C., L.L.O., for appellant.

David A. Dudley and Micah C. Hawker Boehnke, of Baylor Evnen, L.L.P., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

# I. INTRODUCTION

Benjamin Melton sought workers' compensation benefits after an injury resulted in a below-the-knee amputation of his leg. The trial court awarded compensation for a loss of foot and a partial loss of leg function. On appeal, Melton challenges the court's determination of his loss and its decision to not award a penalty regarding permanent loss of his foot or vocational rehabilitation. Because the court's factual findings were not clearly wrong and we find no error of law, we affirm.

# II. BACKGROUND

## 1. Injury and Disability Payments

The City of Holdrege (City) employed Melton as a journeyman lineman. In October 2011, Melton sustained a work-related injury resulting in an amputation of his left leg a few

inches below the knee. In December, he was fitted for a prosthesis, but attaining a good fit was a recurring problem. In March 2012, Melton returned to his position with the City. He was able to perform at least some aspects of his job. Melton did not feel that he could perform his lineman duties without the prosthesis, having tried to do so. While performing his job duties, he encountered issues with the use of his prosthesis, such as shrinking, swelling, sweating, and obtaining a good fit. In 2014, Melton underwent a "stump revision" surgery that helped him obtain a better fit with his prosthetic leg, though he still encountered pain and discomfort.

From the date of the accident until Melton's return to work, the City paid 23 weeks of temporary total disability benefits. Between March 14, 2012, and March 12, 2016, the City paid temporary partial disability benefits for $83\frac{3}{7}$ weeks. In May 2017, Melton provided the City with a record from his physician stating that he had reached maximum medical improvement (MMI) and the City paid permanent partial disability benefits based on a 100-percent loss of Melton's foot and an additional 5-percent loss to his leg. There is no dispute that the City paid all medical expenses under the fee schedule and all temporary disability benefits.

## 2. Petition and Trial

In May 2017, Melton filed a petition seeking workers' compensation benefits. He requested temporary and permanent disability benefits, payment of medical expenses, and vocational rehabilitation benefits. He also asked for waiting-time penalties, attorney fees, and interest.

Three years later, the workers' compensation court conducted a trial. The evidence established that in 2018, Melton secured a new position as a corrosion technician with a different employer. He remained in that employment at the time of trial. Melton testified that he continues to suffer pain in his knee, that his knee is weak, and that he does not have much use of his leg without employing a prosthetic device. He cannot

stand for long periods of time or bear weight on the left leg without the prosthetic device. He testified that he would not even try to perform his job duties without his prosthesis.

The court received conflicting evidence concerning an impairment rating for Melton. In an April 2017 record, a doctor determined that Melton's total combined whole person impairment was 40 percent and the "WP Impairment Converted to Lower Extremity" was 32 percent. On the other hand, a different doctor opined within a reasonable degree of medical certainty that Melton's correct impairment rating was a 70-percent permanent partial impairment of his left lower extremity.

The evidence regarding MMI differed, also. A February 2012 medical record stated, "Plan for MMI at one year post injury." In an April 2017 record, a doctor stated that Melton had "reached a medically stable point in time."

### 3. Award

The court awarded Melton future medical care and permanent disability benefits. It rejected Melton's argument that he was entitled to an award for the loss of each toe on his left foot in addition to the loss of that foot. Interpreting Neb. Rev. Stat. § 48-121(3) (Reissue 2010), the court determined that Melton's amputation below the knee entitled him to statutory benefits for 150 weeks. The court found credible Melton's testimony regarding his limitations and retained use of his leg. It concluded that Melton had not lost all functional use of his left leg, but that "his loss of thigh strength and atrophy combined with his knee pain have reduced the function of his leg beyond the loss of his foot." The court found that Melton suffered a 20-percent loss of function to his leg, entitling him to 43 weeks of disability benefits. Thus, the court awarded a combined total of 193 weeks of compensation.

The court recognized the parties' disagreement as to when the City should have begun making periodic permanent disability payments for the amputation of Melton's left foot. It looked for an explanation concerning the City's delay in

paying for the loss of Melton's foot and stated that "[t]he differing dates of MMI by [Dr. Dennis] McGowan (2012) and [Dr. Bryan] Scheer (2017), when combined with the unanswered question of when [the City] received McGowan's opinion, create a factual controversy, if having a medical opinion is required." The court declared that whether MMI must be proved by expert medical opinion was an unanswered question of law, but it concluded that an expert medical opinion was not required where temporary disability benefits are discontinued before MMI. The court found, as a matter of law, that in an uncontested case involving the amputation of a hand, arm, foot, or leg, payment for permanent disability for the amputation should begin immediately at the discontinuance of temporary disability benefits or MMI, whichever occurs first. Based on that finding, the court determined that Melton's entitlement to payment for the amputation of his foot began on June 17, 2012, when he returned to full-time work and his temporary disability benefits were discontinued.

The court denied Melton's requests for a waiting-time penalty and vocational rehabilitation. In declining to award a penalty, the court found that "a reasonable controversy exists regarding an unanswered question of law" as to whether the discontinuance of temporary disability payments triggers payment of permanent disability payments in a case involving an amputation. Because Melton had secured substantial gainful employment, the court denied his request for vocational rehabilitation.

Melton filed a timely appeal, which we moved to our docket.[1]

## III. ASSIGNMENTS OF ERROR

Melton assigns that the court erred in (1) failing to evaluate his loss and the loss of use of his leg without the assistance of his prosthetic device in determining impairment; (2) failing

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2020).

to award him for the total loss of use of his leg; (3) failing to award him consecutive disability benefits for the total loss of all his toes, his foot, and use of his leg pursuant to § 48-121(3); (4) failing to award waiting-time penalties, attorney fees, and interest for late payment associated with the total loss of his foot; and (5) failing to find that he was entitled to an award of vocational rehabilitation services for satisfying criteria of Neb. Rev. Stat. § 48-162.01(3) (Reissue 2010) despite no further services being requested or necessary at the time of trial.

## IV. STANDARD OF REVIEW

[1] A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.[2]

[2] On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong.[3]

[3] An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law.[4]

## V. ANALYSIS

### 1. Determination of Loss

Melton challenges three aspects of the court's determination of his loss. First, he argues that in determining his impairment, the court failed to evaluate loss of use of his left leg without the prosthesis attached. Second, Melton contends that the

---

[2] *Rogers v. Jack's Supper Club*, 308 Neb. 107, 953 N.W.2d 9 (2021).

[3] *Parks v. Hy-Vee*, 307 Neb. 927, 951 N.W.2d 504 (2020).

[4] *Rogers v. Jack's Supper Club, supra* note 2.

court should have awarded him compensation for the total loss of use of his leg. Third, Melton claims that the court erred in failing to award him consecutive disability benefits for a total loss of all his toes, his foot, and use of his left leg. Before addressing these challenges, we review statutory language central to our analysis.

[4] Section 48-121(3) generally provides the manner by which a worker is compensated for the loss or loss of use of a scheduled member.[5] Loss of a foot or leg are examples of scheduled member injuries. Under § 48-121(3), compensation for the loss of a foot lasts for 150 weeks while compensation for loss of a leg extends for 215 weeks. The statute specifies that "amputation between the knee and the ankle shall be considered as the equivalent of the loss of a foot," while "amputation at or above the knee shall be considered as the loss of a leg."[6] Under § 48-121(3), Melton's amputation is considered a loss of a foot.

Section 48-121(3) also touches on loss of use of a scheduled member. A permanent total loss of the use of a leg is considered as the equivalent of the loss of such leg.[7] For a permanent partial loss of the use or function of a leg, "the compensation shall bear such relation to the amounts named in such subdivision as the disabilities bear to those produced by the injuries named therein."[8] We now turn to Melton's arguments.

### (a) Consideration of Prosthesis

Melton argues that the court erred by determining the loss of use of his left leg with the prosthetic device rather than without the use of a prosthesis. We disagree that it did so.

The court's award recognized Melton's limitations and use of a prosthesis. It acknowledged Melton's testimony that he

---

[5] *Smith v. Mark Chrisman Trucking*, 285 Neb. 826, 829 N.W.2d 717 (2013).

[6] § 48-121(3).

[7] See *id.*

[8] *Id.*

would have no functional use of his leg without the prosthesis and that the function of his leg was reduced by his loss of thigh strength, atrophy, and knee pain. But the court found that Melton "has not lost all functional use of his left leg."

The court's factual finding is not clearly wrong. The court explained, "The retained strength and function in the knee and thigh, although reduced, enable [Melton] to walk, climb steps, navigate uneven terrain, and generally support the use of the prosthesis below the knee." This comports with Melton's testimony regarding what he could do *without his prosthesis*: he could "pick up [his left] leg . . . waist high," crawl up stairs, climb ladders (although Melton qualified that doing so would be "tough" and not "very safe"), and navigate uneven terrain by "crawl[ing] or scoot[ing] or slid[ing]." Because the court did not determine Melton's loss based on use of his prosthesis, this assignment of error lacks merit.

### (b) Total Loss of Use of Leg

Melton next argues that the court should have awarded him for a total loss of use of his left leg. He claims that without the prosthesis, his leg is a useless object for all practical intents and purposes. But Melton's left leg was not useless—he remained able to bend his knee and support weight on the residual limb. As discussed above, the court's finding that Melton had not lost all functional use of his leg was not clearly wrong.

Melton relies on a Pennsylvania test mentioned by the Nebraska Court of Appeals in one of its decisions. In *Jacob v. Columbia Ins. Group*,[9] an employee suffered such extensive injuries to his left hand that doctors considered amputating it, but were ultimately able to save part of it. The Court of Appeals found Pennsylvania's "'practical intents and purposes' test" to be persuasive on the question of whether the employee suffered such disability to his hand that the hand served no real purpose.[10] The Court of Appeals found as a matter of

---

[9] *Jacob v. Columbia Ins. Group*, 2 Neb. App. 473, 511 N.W.2d 211 (1994).

[10] *Id.* at 487, 511 N.W.2d at 219.

law that the employee's left hand was useless and that he suffered a 100-percent disability to his hand.

Using that test, Melton argues that he has sustained a 100-percent loss of use of his left leg for all practical intents and purposes. However, the court's finding that Melton retained enough strength in his left leg to use the prosthetic device is supported by the record. We cannot find that Melton's left leg was useless.

Melton next contends that the effects of his amputation were not usual, logical, and expected. Long ago, in considering whether an employee who sustained an injury to his thumb should also be compensated on the basis of an injury to the hand, we observed that injuries to the thumb and to the hand were separate scheduled injuries under § 48-121(3) and that we had "consistently held that where the effect of an injury to a finger only is the usual and natural one, compensation cannot be allowed for loss of use of the hand."[11] In *Jacob*, the Court of Appeals applied the principle for loss of or injury to any of the scheduled members listed in § 48-121(3), stating that "so long as the injury is only to a lesser member, the scheduled compensation for loss of or injury to that member controls, unless there is an unusual and unexpected result to the greater members."[12] Here, the trial court found that Melton suffered an additional 20-percent loss of function in his leg that went beyond what would have otherwise been expected after amputation of his left leg below the knee. We find no clear error in this regard.

### (c) Failure to Make Consecutive Awards

Melton further argues that the court erred in failing to award him consecutive amounts of disability benefits for the loss

---

[11] *Herold v. Constructors, Inc.*, 201 Neb. 697, 701, 271 N.W.2d 542, 544 (1978).

[12] *Jacob v. Columbia Ins. Group, supra* note 9, 2 Neb. App. at 484, 511 N.W.2d at 217.

of his five toes, the loss of his left foot, and the total loss of his left leg. He relies on the following statutory language:

> In any case in which there is a loss or loss of use of more than one member or parts of more than one member set forth in this subdivision, but not amounting to total and permanent disability, compensation benefits shall be paid for the loss or loss of use of each such member or part thereof, with the periods of benefits to run consecutively.[13]

[5] Melton's argument is refuted by statutory language found in the same paragraph. As we mentioned above, § 48-121(3) explicitly states that a below-the-knee amputation is the equivalent of a loss of a foot. It is obvious that such a loss would include a loss of the toes on the foot, but the Legislature limited the loss to the foot. This is in line with the general rule that a party may not have double recovery for a single injury.[14]

For the reasons discussed above, the trial court's finding that Melton did not suffer a total loss of use of his leg was not clearly wrong. The court appropriately compensated Melton for the functional loss of his leg that was not already accounted for in the compensation for the loss of his foot. Being mindful that double recovery is disallowed and that loss of a leg is compensated for 215 weeks, the court was careful to award loss of use benefits for the leg that when coupled with the 150-week award for loss of a foot, would not exceed 215 weeks. We affirm the court's award of a combined total of 193 weeks of compensation.

## 2. Penalty, Interest, and Attorney Fees

Melton argues that the court erred by failing to award a waiting-time penalty, interest, and attorney fees with respect to late payment of permanent disability benefits for the loss of

---

[13] § 48-121(3).

[14] See *D'Quaix v. Chadron State College*, 272 Neb. 859, 725 N.W.2d 558 (2007).

his foot. He does not quarrel with the trial court's conclusion regarding when permanent disability benefits become due for an amputation. Rather, he challenges only the court's factual finding that a reasonable controversy existed.

Here, the parties' disagreement centered on when the City should have made payments for the permanent loss of Melton's foot. Melton argued that payment was due when his entitlement to temporary disability ceased. On the other hand, the City asserted that permanency benefits should be paid only after MMI has been reached and that it timely paid such benefits within 30 days of being provided proof that Melton had reached MMI. The City contends that this disagreement amounted to a reasonable controversy.

[6,7] Neb. Rev. Stat. § 48-125 (Cum. Supp. 2020) authorizes a 50-percent penalty payment for waiting time involving delinquent payment of compensation and an attorney fee, where there is no reasonable controversy regarding an employee's claim for workers' compensation.[15] A "reasonable controversy" exists (1) if there is a question of law previously unanswered by the Supreme Court, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the compensation court about an aspect of an employee's claim, which conclusions affect allowance or rejection of an employee's claim, in whole or in part.[16]

[8] Whether a reasonable controversy exists under § 48-125 is a question of fact.[17] The compensation court determined that a reasonable controversy existed due to "an unanswered question of law" regarding the timing of permanent disability payments. Our case law is clear that temporary disability benefits are discontinued at the point of MMI and that when

---

[15] *Picard v. P & C Group 1*, 306 Neb. 292, 945 N.W.2d 183 (2020).

[16] See *id.*

[17] *Id.*

an injured employee reaches MMI, any remaining disability is permanent.[18] We have also declared that MMI is not reached until *all* of the injuries resulting from an accident have reached maximum medical healing and that our law does not provide for partial MMI.[19] In this case, the City last paid temporary partial disability benefits in March 2016, which suggests Melton had reached MMI. That Melton had reached MMI was made clear in a May 2017 letter in which Melton's counsel informed the City that "Melton is now at MMI for the remaining impairment for the injury to his knee and leg." Ten days later, the City mailed a check for the 100-percent loss of a foot. In finding a reasonable controversy, the court explained that "[o]ur appellate courts have not ruled that the discontinuance of temporary disability payments triggers payment of permanent disability payments in a case involving an amputation." We agree that this was an unanswered question. Accordingly, we find no clear error in the compensation court's finding that a reasonable controversy existed.

## 3. Vocational Rehabilitation

Finally, Melton faults the court for not awarding vocational rehabilitation benefits. He emphasizes the importance of his prosthesis and of coworkers' assistance in his ability to return to work. Melton argues that the court was "required to enter an award of vocational services as [he] has satisfied criteria a, b, c and d as set forth in [§] 48-162.01."[20] Melton misconstrues the statute.

Under § 48-162.01(3), an employee who, due to an injury, "is unable to perform suitable work for which he or she has previous training or experience, . . . is entitled to such

---

[18] See *Gardner v. International Paper Destr. & Recycl.*, 291 Neb. 415, 865 N.W.2d 371 (2015).

[19] See *Rodriguez v. Hirschbach Motor Lines*, 270 Neb. 757, 707 N.W.2d 232 (2005).

[20] Brief for appellant at 30.

vocational rehabilitation services, including job placement and training, as may be reasonably necessary to restore him or her to suitable employment." The statute sets forth priorities to "be used in developing and evaluating a vocational rehabilitation plan."[21] The priorities are contained in a list from (a) to (e), which are listed in order from lower priority to higher priority. Section 48-162.01(3) specifies that no higher priority may be used unless the lower priorities would be unlikely to result in suitable employment for the injured employee.

[9] Whether an injured worker is entitled to vocational rehabilitation is ordinarily a question of fact to be determined by the compensation court.[22] In declining to award vocational rehabilitation, the court relied on Melton's testimony that he had secured, and was capable of performing, substantial gainful employment. Although Melton believed he would need vocational rehabilitation if he became unable to continue his present employment, the court stated that it could not engage in speculation or give advisory opinions.

[10] We find no clear error in the court's decision to deny vocational rehabilitation benefits. The evidence establishes that Melton is able to perform suitable work for which he has previous training or experience. He testified that he felt comfortable with his ability to continue performing the essential functions of his job. Although Melton desired an award of vocational rehabilitation in case he needed services in the future, a workers' compensation award cannot be based on mere possibility or speculation.[23]

To the extent Melton is arguing he should be entitled to vocational rehabilitation based on a future loss of his existing employment but without an increase in his disability, this argument invites us to provide an advisory opinion. We decline to do so.

---

[21] § 48-162.01(3).

[22] *Bower v. Eaton Corp.*, 301 Neb. 311, 918 N.W.2d 249 (2018).

[23] See *id.*

## VI. CONCLUSION

We find no clear error in the court's determination that Melton did not suffer a total loss of his leg, but, rather, suffered a 20-percent loss of function to his leg that went beyond what would have been otherwise expected following amputation of his leg below the knee. We cannot say that the court was clearly wrong in finding the existence of a reasonable controversy regarding timing of payments for the loss of Melton's foot. Finally, because Melton was performing suitable work for which he had previous training or experience, the court did not err in denying vocational rehabilitation benefits. We affirm the judgment.

AFFIRMED.

STACY, J., not participating.